PHILIP H. FRIEDMAN AND ANNA FRIEDMAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Friedman v. Commissioner
Docket No. 7359-90
United States Tax Court
T.C. Memo 1993-549; 1993 Tax Ct. Memo LEXIS 559; 66 T.C.M. (CCH) 1404; November 23, 1993, Filed *559 Decision will be entered for respondent. For petitioners: Jay J. Freireich, Harvey R. Poe, and Gerald S. Rotunda. For respondent: Susan G. Lewis, Albert G. Kobylarz, and Guy G. Lavignera. GERBER
GERBER
MEMORANDUM FINDINGS OF FACT AND OPINION GERBER, Judge: Respondent, by means of a statutory notice of deficiency, determined Federal income tax deficiencies and additions to tax for petitioners' 1981, 1982, 1983, 1984, and 1985 taxable years as follows: Additions to Tax
Sec.
Sec.
Sec.
Years
Income Tax
6653(a)(1)
6653(a)(2)
6661
1981
$  41,221.00
$  2,061.05
[1]
--  1982
129,944.00
6,497.20
[1]
$  32,486.00
1983
119,644.76
5,982.24
[1]
29,911.18
1984
183,985.50
9,199.28
[1]
45,996.38
1985
501,303.00
25,065.15
[1]
125,325.75
All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated. In the Amendment to Answer filed March 11, 1991, respondent asserted additions to tax for petitioners' *560 1981 and 1982 taxable years under sections 6654 and 6651(a)(2). Petitioner husband, Philip Friedman, conceded all income tax deficiencies for the 1981 through 1985 taxable years. He also conceded the additions to tax under sections 6653(a)(1) and (2) and 6661, and increased interest under section 6621(c) for the 1983 through 1985 taxable years. The issues for consideration are (1) whether petitioner wife, Anna Friedman, qualifies for relief under the innocent spouse provisions of section 6013(e); and (2) whether petitioners are liable for the additions to tax and increased interest for their 1981 and 1982 taxable years. FINDINGS OF FACT Some of the facts have been stipulated, and the stipulation of facts and attached exhibits are incorporated by this reference. At the time of filing the petition herein, petitioners resided in Bayside, New York. Throughout the years in issue, Philip Friedman was president of the Friedman Drew Corp.The Friedman Drew Corp. was a mortgage broker company that found financing for developers of major projects throughout the country. Mr. Friedman, as a mortgage broker, would obtain loans for the developers from banks, insurance companies, and pension *561 funds. Friedman, Kaplan, Drew Corp., the predecessor to the Friedman Drew Corp., was formed in 1966. The name was changed to the Friedman Drew Corp. in 1969 and it continued to operate until 1986. In 1986, Philip Friedman formed the Philip H. Friedman Co. as a sole proprietorship. Philip and Anna Friedman met in 1976 when Philip hired Anna as his secretary. Anna's first husband died in 1975, and she started working for Philip in early 1977 to support her two daughters. At that time, Philip was married to Hannah Diamond. Philip and Hannah were divorced in 1979. Anna and Philip were married on October 18, 1979. Anna Friedman had considerable experience as a secretary before she started working for Philip Friedman. As Philip's secretary at the Friedman Drew Corp., Anna answered the telephone, made appointments, took dictation, and transcribed letters. More specifically, she set up and maintained Philip's business files for his deals, she typed up the correspondence and contracts for his deals, she monitored the mail, and made bank deposits if necessary. When Philip was out of the office, he called in and spoke to Anna so he could get his messages or any other necessary information. *562 Usually when Philip was away from the office, Anna knew where he was. Philip earned income in the form of commissions on closed deals. Anna was aware of the terms and conditions of these deals, including Philip's commission, and knew that he made big money when he made money. During 1977 through 1979, Anna was the only secretary or receptionist at the Friedman Drew Corp. The only other employees at that time were Herbie Safe, an associate mortgage broker, and Molly Ellison, the bookkeeper. Ms. Ellison was a part-time employee who only worked 3 days a week. Mr. Safe left the Friedman Drew Corp. sometime between 1977 and 1979. Anna Friedman worked at the Friedman Drew Corp. until 1982. After that time, she worked at the office when her help was needed. Because Anna was Philip's full-time secretary and one of a few Friedman Drew Corp. employees, she became familiar with Philip's business operations. As a mortgage broker, Philip Friedman did a lot of business entertaining. He took clients, such as developers and bankers, to dinners, shows, etc. He entertained in New York, Florida, Puerto Rico, Las Vegas -- anyplace he did business. Anna acted as Philip's hostess at these *563 business functions. Whenever Philip traveled on business, he would take Anna along. He considered it one of Anna's duties to entertain clients while on business trips. Often, Philip and Anna would stay an extra day on a business trip to relax. Petitioners' Lifestyle
When petitioners were first married, they lived in an apartment in New York City with Anna's two daughters, who were 13 and 17 years old. In 1982, petitioners bought a condominium in Bayside, Queens, because they thought it would be a better environment to raise children. The condo was purchased jointly, without a mortgage, for $ 171,000. Petitioners hired an interior decorator to decorate the condo in 1982 and again in 1985, spending over $ 50,000 total. Petitioners also owned a home on Fire Island. They purchased the land in 1978 and built a house in 1979, all without a mortgage on the property. Philip transferred the Fire Island property to Anna, as sole owner, in 1980. Philip paid for the support, clothing, medical expenses, education (including college), etc. for Anna's two daughters, although he never adopted them. During the years in issue, Anna received a black mink coat. Petitioners went on *564 an annual, week-long vacation to Puerto Rico and, occasionally, Anna's daughters would go with them. Petitioners had a joint bank account to pay household expenses. Philip Friedman would deposit either cash or checks into the account for Anna to use to pay various expenses. Petitioners also paid for a variety of their expenses in cash. Philip would give Anna the cash for her to pay for groceries, dry cleaning, their cleaning woman, etc. The cash Philip gave Anna was in addition to the money he deposited in the joint account. Philip also had several individual bank accounts. In 1984 or 1985, petitioners took out a mortgage on the Bayside condominium for $ 175,000. Also in the mid-eighties, petitioners took out a $ 150,000 mortgage on the Fire Island property. At the time the mortgage was placed on the Fire Island property, Anna was the sole owner, but Philip was jointly liable for the mortgage. During the years in issue petitioners invested in various real estate ventures, which was another source of income. Gambling
Petitioners liked to gamble. They went to Las Vegas on their honeymoon and took other gambling vacations such as their annual trip to Puerto Rico. *565 Philip Friedman would go on day trips to Atlantic City or take weekend trips to Las Vegas. Anna occasionally would accompany Philip on the weekend trips, or they would go with Adrienne and Elwood Lerman (Lerman). The Lermans and petitioners were very good friends and often went on weekends or vacations together. Lerman was also petitioners' accountant and financial adviser. Some of these gambling trips would be "comped"; i.e., the casino would pay for their travel, meals, and hotel room. While on these trips, Philip would spend most of his time in the casinos gambling. He usually gambled at the craps table, and preferred the tables with a large minimum bet. While Philip gambled, Anna would either gamble at a different table or go shopping. Anna was aware of the amount of time Philip spent gambling, and they would often argue about it. Philip gambled with large amounts of money. He often signed markers to the casinos to get more cash to gamble with. Philip tried to pay off the markers before they would go through the joint account. When Anna was with him, Philip tried to hide the size of his bets and his winnings or losings from her. Petitioners also spent time at the racetrack. *566 Often they would go with the Lermans for an evening at the racetrack. Anna would make small bets during the evening, but Philip made larger, more substantial bets. He tried to keep the tickets hidden, or show Anna tickets with smaller bets, so that she would not know how much money he was risking. Petitioners even invested in racehorses. They had an interest in several racehorses during the years in issue. Equipment-Leasing Transaction
On June 20, 1983, Philip Friedman invested in a computer-leasing transaction. Philip learned about the deal from Leon Baker (Baker), a tax attorney in New York. Philip told Baker that he needed a tax shelter, and Baker suggested the computer leasing deal. They had several meetings, which culminated in Philip's signing into the deal. Lerman was present at some of the meetings regarding the tax shelter. Lerman advised Philip not to invest in the deal because he thought it was risky, but Philip invested because he wanted the tax benefits. As part of the deal, Philip paid Baker $ 170,000 toward the purchase price of $ 6,003,500 for computer equipment. Philip executed a nonrecourse promissory note for the remainder of the purchase price. *567 The equipment was then leased to a company organized and doing business in the Netherlands. Philip never saw the equipment, checked to see if it existed, or investigated if it was worth the purchase price. He had no other involvement other than the payments described above. Under the terms of the lease agreement the lessee paid rent and all taxes related to the equipment, all miscellaneous charges, all the maintenance expenses, and the lessee had the risk of loss. On his tax returns, the disallowed losses related to the tax shelter are as follows: 1981
NOL carryback
$   134,176
1982
NOL carryback
288,593
1983
Net loss
900,525
1984
Net loss
1,251,119
1985
Net loss
920,384
Capital Loss Carryover
On petitioners' 1980 joint income tax return, they claimed but did not use a net short-term capital loss of $ 327,600. On their 1983 tax return, petitioners claimed a short-term capital loss carryover from the 1980 tax year of $ 322,340. Respondent, in the statutory notice of deficiency, allowed $ 55,803 of this loss carryover. The balance of the loss was allowed in the 1980 taxable year pursuant to an audit examination of the 1980 tax year. Tax Return Preparation
*568 Lerman, petitioners' accountant and friend, prepared petitioners' tax returns for the years in issue. He prepared petitioners' joint income tax return and the Friedman Drew Corp's tax return. Petitioners and Lerman would meet in Lerman's office early in the year and discuss preparation of the prior year's joint income tax return. Anna Friedman would bring the records from the joint, household account. She would bring the mortgage interest statement from the condo residence, the mortgage interest statement from the Fire Island residence, and Forms 1099. From the bank records, they would calculate tax-related items such as, medical expenses, medical reimbursements, and charitable contributions. Usually, Anna would have already figured out these amounts and would give Lerman the totals she had compiled. Anna saved records and knew what was important because she did it every year and because she had experience from preparing her mother's tax return. Anna was always present at the meetings with Lerman regarding the preparation of petitioners' joint income tax return, although she did not ask Lerman questions. After a return was complete, Lerman mailed it to petitioners with instructions *569 for signing, mailing, and payment. When Anna signed a return, she looked to see how much tax they had to pay. She did not flip through the return to see if the information that she supplied Lerman was on the return. She noticed adjusted gross income on the first page of the return and the amount owed to the Internal Revenue Service. She never asked if the amount owed had been paid, she just assumed that Philip would take care of it. In fact, petitioners made no payments toward their amount owed reflected on their 1981 and 1982 joint income tax returns. On their 1981 return, petitioners showed an unpaid tax liability of $ 27,895 and an estimated tax penalty of $ 1,831. On their 1982 return, petitioners showed an unpaid tax liability of $ 130,055 and an estimated tax penalty of $ 12,591. On the 1983 tax return, Anna noticed that they did not owe any tax. She asked Philip why, and he simply said that he had invested in a tax shelter and not to worry about it. She did not question her husband further and did not suspect that it was fraudulent. Page 1 of petitioners' 1983 Form 1040, U.S. Individual Income Tax Return, showed negative adjusted gross income of $ 661,337. Anna *570 noticed the negative adjusted gross income amount, but she thought that it went together with the tax shelter explanation and did not worry about it. She never questioned if it would affect her lifestyle or if it represented an actual out-of-pocket loss. Furthermore, Anna never asked Lerman about the tax shelter losses. In February 1984, petitioners filed a Form 1045, Application for Tentative Refund. The form reflected the carryback of a net operating loss to petitioners' 1981 and 1982 tax years in the amounts of $ 134,176 and $ 288,593, respectively. The refund claimed on the form was $ 41,221 and $ 129,944 for 1981 and 1982, respectively. Anna Friedman signed the Form 1045 and at the time she signed she understood that a refund was money that the Government pays back. When she signed the form, she understood that the refund had something to do with the tax shelter, but she did not investigate any further. Petitioners met with Lerman to discuss preparation of their 1984 joint income tax return in early 1985. Even though Anna had signed both the 1983 Form 1040 and the Form 1045, she did not discuss the tax shelter with Lerman at this meeting. Petitioners' 1984 joint income *571 tax return shows negative adjusted gross income of $ 595,597. Also, on page 1 of the Form 1040 petitioners claimed a business loss of $ 1,251,119 and a zero tax liability on page 2. Anna noticed the negative income amount and the zero tax liability, and she signed the 1984 return without questioning what the loss represented because she knew that it related to the tax shelter. On the 1985 Form 1040, petitioners showed a negative adjusted gross income of $ 936,475 and a zero tax liability. Once again, Anna noticed the negative amounts and the zero tax liability, and signed the return without further inquiry. OPINION As a general rule, spouses that file a joint return are jointly and severally liable for the tax due on their aggregate income. Sec. 6013(d)(3). Section 6013(e), however, provides that one spouse shall be relieved of the liability for tax if all the requirements are met. Section 6013(e)(1) provides: (1) In General. -- Under regulations prescribed by the Secretary, if -- (A) a joint return has been made under this section for a taxable year, (B) on such return there is a substantial understatement of tax attributable to grossly erroneous items of one spouse, *572 (C) the other spouse establishes that in signing the return he or she did not know, and had no reason to know, that there was such substantial understatement, and (D) taking into account all the facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such substantial understatement,
then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent such liability is attributable to such substantial understatement.
The requirements of section 6013(e)(1) are conjunctive, rather than alternative. Therefore, the failure to meet any one of the requirements prevents a spouse from qualifying for relief from liability. Petitioners filed joint returns for 1981 through 1985 and filed Forms 1045 for the 1981 and 1982 taxable years. In Friedman v. Commissioner, 97 T.C. 606 (1991), we held that petitioner wife has met the "on such return" requirement of section 6013(e)(1)(B). Therefore, the specific issues for consideration are: (1) Whether there are substantial understatements of tax attributable *573 to grossly erroneous items of petitioner husband for the years in issue; (2) whether petitioner wife knew, or had reason to know, of the substantial understatements when she signed the returns for the years in issue; and (3) whether, taking into account all the facts and circumstances, it is inequitable to hold petitioner wife liable for the deficiencies in tax attributable to the substantial understatements for the years in issue. Grossly Erroneous Items
Petitioner wife must prove that the deductions from the computer-leasing transaction and from the capital loss carryover are substantial understatements of tax attributable to grossly erroneous items of one spouse. Sec. 6013(e)(1)(B); Rule 142(a). Section 6013(e)(3) defines substantial understatement as any understatement (as defined in section 6661(b)(2)(A)) which exceeds $ 500. Each of the deductions claimed with respect to the equipment-leasing transaction exceeds $ 500 and the capital loss carryover also exceeds $ 500; therefore, this requirement is met. The equipment-leasing transaction and capital loss transaction were entered into by Philip Friedman, not petitioners jointly. Therefore, the deductions are attributable *574 to petitioner husband. Section 6013(e)(2) defines grossly erroneous items as "any claim of a deduction, credit, or basis by such spouse in an amount for which there is no basis in law or fact." Sec. 6013(e)(2)(B). The phrase "no basis in law or fact" has been defined as follows: As we read the statute as a whole and its legislative history, a deduction has no basis in fact when the expense for which the deduction is claimed was never, in fact, made. A deduction has no basis in law when the expense, even if made, does not qualify as a deductible expense under well-settled legal principles or when no substantial legal argument can be made to support its deductibility. Ordinarily, a deduction having no basis in fact or in law can be described as frivolous, fraudulent, or, to use the word of the committee report, phony. [Douglas v. Commissioner, 86 T.C. 758, 762-763 (1986); fn. ref. omitted.]
The fact that respondent disallowed the deductions does not, per se, prove a lack of basis in law or fact. Id. at 763. With respect to the losses claimed for the computer-leasing transaction, petitioners argue that the *575 deductions were grossly erroneous because the transaction lacked economic substance and petitioner husband only invested for the tax benefits. Respondent argues that petitioner husband had a profit objective when he invested in the deal, and therefore, the deductions were not grossly erroneous. We agree with petitioners. Petitioners rely heavily on Coleman v. Commissioner, 87 T.C. 178 (1986), affd. without published opinion 833 F.2d 303 (3d Cir. 1987). Coleman, however, did not concern whether the deductions were grossly erroneous. Therefore, we do not find Coleman v. Commissioner, supra, controlling. However, Coleman is persuasive in that this Court held that, with respect to a computer leasing transaction promoted by Baker similar to the one at issue here, the taxpayers did not have a depreciable interest in the equipment and that the interest on the nonrecourse note was not deductible. Id. at 208-213. Under the leasing transaction, Philip Friedman had no ownership interest in the property. He had no benefits or burdens of ownership and, in *576 fact, did not even know if the equipment existed or, if it existed, if it was worth the purchase price. He entered into the deal solely for the tax benefits and never intended to have any ownership interest in the equipment. See Frank Lyon Co. v. United States, 435 U.S. 561, 573 (1978). Without relying on Coleman v. Commislioner, supra, we find that the computer-leasing transaction was without economic substance and was entered into solely for the tax benefits. A transaction without substance has no significance beyond expected tax benefits, even though papers characterize the transaction differently, and the form is not binding. Frank Lyon Co. v. United States, supra; Falsetti v. Commissioner, 85 T.C. 332, 347 (1985). Because the transaction lacked economic substance, the deductions had no basis in fact or law, and, therefore, the deductions attributable to the leasing transaction are grossly erroneous. With respect to the capital loss carryover, at the time petitioners filed their 1983 return, the 1980 return had not been audited. Therefore, *577 when the 1983 return was filed with the capital loss carryover, petitioners did not know that the carryover duplicated losses allowed in 1980. The later disallowance was purely mechanical and a natural result of an adjustment to a prior year's return. Therefore, at the time petitioners filed their 1983 joint income tax return claiming the loss carryover, the deduction had a basis in fact or law and the deduction is not grossly erroneous. Reason to Know of Substantial Understatement
To qualify for relief as an innocent spouse, Anna Friedman must show that she did not know, or have reason to know, that the deductions would give rise to substantial understatements when she signed the returns for the years in issue. Sec. 6013(e)(1)(C); Rule 142(a); Hayman v. Commissioner, 992 F.2d 1256, 1261 (2d Cir. 1993), affg. T.C. Memo. 1992-228. To meet this burden, she must prove (1) that she did not have actual knowledge of the understatement of tax, and (2) that a reasonably prudent person with her experience and intelligence would not be expected to know of the substantial understatement or that further investigation was warranted. *578 Id.; Bokum v. Commissioner, 94 T.C. 126, 146-148 (1990), affd. 992 F.2d 1132 (11th Cir. 1993). Furthermore, to qualify for relief as an innocent spouse, petitioner wife must establish that she was unaware of the circumstances that gave rise to error on the return, and not merely unaware of the tax consequences. Hayman v. Commissioner, supra at 1262. Anna Friedman knew that her husband, Philip, invested in a tax shelter. She knew that the tax shelter was the explanation as to why they did not owe any tax and why they had negative adjusted gross income. She also knew that the tax shelter was the reason for the tax refund. She noticed the amounts on the joint income tax returns and the Form 1045 and signed without investigating their correctness. Anna met with their tax preparer annually, and saw him more frequently socially. She had ample opportunity to investigate the tax shelter, but chose not to. Therefore, she had reason to know of the circumstances that gave rise to the understatement. Section 6013(e) is designed to protect the innocent, not those who had a choice and intentionally *579 ignore the facts. Petitioner husband did nothing to conceal the tax returns or the tax shelter from petitioner wife. He did not force her to sign returns without looking at them; in fact, he let her review them. She noticed important information, such as adjusted gross income and how much tax they owed. The understatements were in the form of deductions, not omissions of income, so a cursory review of the returns would reveal substantial deductions and tax savings. On page 1 of the 1984 Form 1040, petitioners claimed a $ 1,251,119 business loss deduction. Petitioner wife noticed this and chose to ignore it instead of investigating further. She was not concerned about whether or not her lifestyle would be affected or whether her husband's business was in danger. The law should not protect people who choose to turn their back on the obvious. Petitioner wife had experience preparing her mother's tax returns and had significant experience in her husband's business. A reasonably prudent person of her experience and intelligence would have reason to know of the understatement or reason to know that further inquiry was warranted. Accordingly, we hold that petitioner wife had reason *580 to know of such substantial understatement and, therefore, does not qualify for relief from liability as an innocent spouse. Additions to Tax and Increased Interest for 1981 and 1982
With respect to the additions to tax under sections 6653(a)(1) and (2) and 6661, and increased interest under section 6621(c) raised in the notice of deficiency, respondent's determinations are presumed to be correct, and petitioners bear the burden of proof to show that respondent's determination is incorrect. Rule 142(a). Petitioners presented no evidence to overcome the presumption. Therefore, petitioners are liable for the additions to tax under sections 6653(a)(1) and (2) and 6661, and increased interest under section 6621(c) for their 1981 and 1982 taxable years. With respect to the additions to tax under sections 6654 and 6651(a)(2) raised in the Amendment to Answer, respondent bears the burden of proof. Rule 142(a). Petitioners admitted liability for estimated tax penalties under section 6654 on their 1981 and 1982 tax returns of $ 1,831 and $ 12,591, respectively. Petitioners stipulated that they made no payments on their unpaid tax liabilities shown on their 1981 and 1982 joint *581 income tax returns in the amounts of $ 27,895 and $ 130,055, respectively. Therefore respondent has met her burden, and petitioners are liable for the additions to tax under sections 6654 and 6651(a)(2) for their 1981 and 1982 taxable years. Decision will be entered for respondent. Footnotes
1. 50 percent of the interest payable with respect to the portion of such underpayment which is attributable to negligence.↩