Philip FRIEDMAN, Petitioner,

Anna Friedman, Petitioner–Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE, Respondent–Appellee.

No. 569, Docket No. 94–4014.

United States Court of Appeals, Second Circuit.

Argued Dec. 9, 1994.

Decided April 26, 1995.

Jay J. Freireich, Florham Park, NJ (Harvey R. Poe, P.A., of counsel), for appellant.

Sara S. Holderness, Tax Div., Dept. of Justice, Washington, DC (Loretta C. Argrett, Asst. Atty. Gen., Gary R. Allen, Richard Farber, attorneys, Tax Div., Dept. of Justice, of counsel), for appellee.

Before: OAKES, CARDAMONE and WINTER, Circuit Judges.

CARDAMONE, Circuit Judge:

Individuals filing a joint tax return, often married couples, are jointly and severally liable for any tax liability found due and for any penalties and additions to tax. Congress has provided that such joint and several tax liability may sometimes be waived to avoid working a grave injustice to one spouse of the married couple, the so-called "innocent spouse." Anna Friedman (appellant or taxpayer) appeals from a November 30, 1993 decision of the tax court (Gerber, J.) that found she did not qualify for relief as an "innocent spouse" under Internal Revenue Code (I.R.C.) § 6013(e) (1988 & Supp. II 1990). Instead, the tax court sustained the deficiency determinations and additions to tax asserted by appellee Commissioner of Internal Revenue (Commissioner) and held appellant jointly liable with her husband, Philip Friedman, for federal income taxes and additions to tax for the years 1981 through 1985. The issue before us is whether an individual is entitled to assert the "innocent spouse" defense to avoid joint tax liability for tax transactions of which he or she was aware but did not thoroughly understand. The "innocent spouse" exemption was not designed to protect willful blindness or to encourage the deliberate cultivation of ignorance. Extravagant tax savings may alert even a financially unsophisticated spouse to the possible improprieties of a tax scheme.

Nevertheless, we recognize that in the bewildering world of tax shelter deductions, few experts, let alone laypersons, easily discern the difference between a fraudulent scheme and an exceptionally advantageous legal loophole in the tax code. There is a common sense limit we think to a spouse's duty of investigation in those circumstances where the more financially sophisticated spouse invokes the support of tax experts and accountants in asserting an improper deduction. The wife claiming status as an innocent spouse under such circumstances must persuade the fact-finder that she had no reason to suspect that what her more financially sophisticated husband did was wrong. In short, an innocent spouse is one who despite having made reasonable efforts to investigate the accuracy of the joint return remains ignorant of its illegitimacy.

For the reasons discussed below, we reverse the judgment of the tax court in part, affirm it in part, and remand the case for reconsideration on the merits of the innocent spouse defense.

## BACKGROUND

### A. Understatements of Tax

On June 20, 1983 appellant's husband Philip Friedman (Friedman or husband) invested in a computer-leasing transaction designed as an income tax shelter. Friedman paid $170,000 toward the purchase of over six million dollars' worth of computer equipment that was leased back to a Netherlands company. The lessee assumed all the rent, taxes, maintenance and risk of loss on the equipment. In their joint tax return the Friedmans asserted losses on this purchase for 1983, 1984 and 1985. As a result, their adjusted gross

income was negative and their reported tax liability was zero for each of those years.

The Friedmans also claimed carryback loss refunds derived from the tax shelter for the years 1981 and 1982 by filing a Form 1045, Application for Tentative Refund, in February 1984. On this form they sought to carryback net operating losses of $134,176 for the 1981 taxable year and $288,593 for the 1982 taxable year. The Internal Revenue Service (I.R.S.) credited the Friedmans' accounts with losses for those years of $41,221 and $129,944, respectively. The total losses asserted by the Friedmans relating to the equipment-leasing scheme may be summarized as follows:

| Year | Tax Shelter Losses Claimed |
|------|---------------------------|
| 1981 | $134,176 |
| 1982 | $288,593 |
| 1983 | $900,525 |
| 1984 | $1,251,119 |
| 1985 | $920,384 |

In an error unrelated to the tax shelter transaction, the Friedmans claimed a deduction of $322,340 on their 1983 tax return as a short-term capital loss carryover from tax year 1980. This loss was related to an unsuccessful Florida land investment. In 1980 they had reported a net short-term capital loss of $327,600 on the investment, but had not used it, so the entire deduction was still available. In a 1985 audit of the 1980 return, however, the Commissioner allowed a $271,800 capital loss deduction for 1980. The retroactive result was that in 1983 only $55,803 of this loss was available to be carried over. The effect of this, the Friedmans believe, was as if they had claimed the same capital loss twice. Their 1983 carryover loss, although valid at the time they signed the return asserting it, was rendered largely unavailable by the 1985 audit's adjustments to the Friedmans' 1980 return.

In a January 23, 1990 statutory notice of deficiency, the Commissioner disallowed the tax shelter deductions for the taxable years 1981 through 1985. The notice asserted that the Friedmans were liable for those deficiencies, plus additions to tax for negligence, I.R.C. § 6653(a)(1) and (a)(2), and for substantial understatements of tax, I.R.C. § 6661, as follows:

| | | Additions to Tax | | |
|------|----------------|--------------|--------------|--------------|
| Year | Tax Deficiency | § 6653(a)(1) | § 6653(a)(2) | § 6661 |
| 1981 | $ 41,221.00 | $ 2,061.05 | * | — |
| 1982 | 129,944.00 | 6,947.20 | * | $ 32,486.00 |
| 1983 | 119,644.76 | 5,982.24 | * | 29,911.18 |
| 1984 | 183,985.50 | 9,199.28 | * | 45,996.38 |
| 1985 | 501,303.00 | 25,065.15 | * | 125,325.75 |

\* 50 percent of the interest payable with respect to the portion of such underpayment attributable to negligence.

The notice also averred that the Friedmans were liable for the taxable years 1981 through 1985 for the increased interest rate on underpayments arising from tax-motivated transactions, I.R.C. § 6621(c). In a March 1991 amendment to her answer, filed in response to the Friedmans' petition to the Tax Court, the Commissioner also sought additions to tax for failure to pay estimated taxes, I.R.C. § 6654, and for failure to pay taxes, I.R.C. § 6651(a)(2), for the taxable years 1981 and 1982.

In the notice of deficiency, the Commissioner, in addition, disallowed part of the $322,340 short-term capital loss from the Florida land investment carried over from the taxable year 1980 to the taxable year 1983. Because the 1985 audit had resulted in an allowance of $271,800 of the 1980 short-term capital loss of $327,600 as an ordinary loss deduction in 1980, only $55,803 remained available to the Friedmans as a carryover loss in 1983.

## B. *The Friedmans' Economic Circumstances*

We next consider the Friedmans' personal and economic circumstances. Taxpayer first met her future husband when he hired her in 1977 as a full-time secretary and receptionist for his mortgage brokerage company, Friedman Drew Corporation (Friedman Drew). She was a high school graduate, then a widow with two teenaged daughters. Friedman Drew was a small company whose only other employees besides Friedman and appellant were an associate mortgage broker and a part-time bookkeeper. Appellant's responsibilities included scheduling appointments, typing correspondence and contracts, and making bank deposits. Because of these responsibilities, she was generally aware of the terms of the closed deals from which her future husband derived his commission income.

Less than three years after appellant began work at Friedman Drew, Friedman divorced his wife and married taxpayer. She gave up her secretarial position and became a housewife. The Friedmans, at the time of their marriage, owned a North Miami Beach, Florida, condominium and rented a luxury high rise apartment at 30 Lincoln Plaza, New York City. They also owned a three-bedroom vacation home on Fire Island, New York, which taxpayer's husband transferred to her in 1980 as a wedding anniversary present. In 1982 the Friedmans moved from·their Lincoln Plaza apartment.to a condominium in Queens, New York, which they purchased jointly, without a mortgage, for $171,000. They had the condominium decorated in 1982 and redecorated in 1985 at a total cost of over $50,000.

The lifestyle of the Friedmans during the tax years in question was certainly comfortable; it might even be characterized as lavish. Taxpayer testified that she had charge accounts with various New York City department stores, and could within reason buy what she liked. In addition to the $2,000 he deposited monthly into the couple's household checking account, her husband supplied her with frequent handouts of cash. He gave her a black mink coat. Further, Friedman supported appellant, paid her health care costs, and paid for the college education of her two daughters. The couple took frequent weekend trips to Las Vegas and Atlantic City, as well as an annual week-long vacation in Puerto Rico.

The foremost object of these vacations, as well as of numerous evenings at the racetrack, was gambling. Friedman had a severe addiction to gambling, although he took great pains to conceal the size of his wagers from his wife. For instance, he played blackjack with $5 chips when she was nearby and with $100 or higher chips when she was not observing him. Friedman hid his casino markers from taxpayer and attempted to pay them before they went through their joint checking account. He hid in a like manner most of his bets when she accompanied him to the racetrack, occasionally showing her only a small winning ticket.

Although gambling was the cause of repeated quarrels between them, the Friedmans both testified that she had no idea of the extent of her husband's addiction or of the large sums he wagered. Instead, she was upset because of the time he devoted to such activities, time which she would have preferred he spend with her. Appellant testified she only learned of the scope of her husband's gambling losses during the course of the instant I.R.S. action, when in 1990 she had to retrieve old financial records and came across huge gambling markers. Her shock and anger at this discovery led to the couple's separation, and later to their divorce in April 1994.

Philip's gambling losses were indeed massive. Investments in real estate and on race horses also lost him money. His own estimate is that between 1982 and 1990 his gambling losses alone amounted to over one million dollars. When he did manage to have a "lucky streak," often it would only stimulate him to continue play until his "winnings" were eventually dissipated. While these dramatic losses appeared to have no visible impact on the Friedmans' spending habits, there were signs the money supply was tighter than it had formerly been. In the mid-eighties, the Bayside condominium was mortgaged for $175,000, and a $150,000 mortgage was taken on the Fire Island property. Appellant moreover became aware that her husband had obtained loans from a number of his business associates, although she did not know the amounts.

### C. *The Tax Court's Denial of "Innocent Spouse" Status*

■ The main issue at trial was whether appellant qualified for relief as an "innocent spouse" pursuant to I.R.C. § 6013(e), her husband having conceded his liability for all of the asserted deficiencies and most of the additions to tax. The four statutory elements a spouse must establish to qualify for "innocent spouse" status are that (1) a joint return was filed in which (2) there was a "substantial understatement of tax attributable to grossly erroneous items of one spouse," (3) that the other spouse, "in signing the return ... did not know, and had no

reason to know, that there was such substantial understatement," and (4) under the circumstances it would be inequitable to hold the other spouse liable for the resulting deficiencies. I.R.C. § 6013(e), as amended by the Tax Reform Act of 1984, Pub.L. No. 98–369, § 424(a), 98 Stat. 494, 801–802.[1]

That taxpayer has met the first requirement by establishing that a joint return was filed is not contested. The tax court found that the short-term capital loss carryover from the Florida land investment claimed in 1983 failed the second requirement because it was not "grossly erroneous" when claimed. As already stated, that claim only became duplicative in retrospect after a 1985 audit allowed part of the amount as an ordinary loss for the 1980 taxable year. Thus, the tax court concluded that in 1983 this item had a basis in law and fact.

With respect to the tax shelter deductions, the tax court found that these items were "grossly erroneous," but that taxpayer had failed to establish her lack of knowledge of the substantial understatement. The court noted that appellant knew about the tax shelter and had opportunities to enquire into the correctness of the deductions it gave rise to, but that without investigation she signed the joint tax returns and Form 1045. Importantly, she had looked at the couple's tax returns and noticed the significant negative adjusted gross income and lack of any tax liability. The tax court therefore denied taxpayer's contention that she was entitled to innocent spouse status, observing that "[t]he law should not protect people who choose to turn their back[s] on the obvious." 66 T.C.M. (CCH) 1404, 1409 (1993).

Specifically, it noted the following facts suggesting that taxpayer was not financially naïve. She attended an annual meeting with her husband in the office of their accountant, Elwood Lerman, to discuss the preparation of the couple's tax return. She was responsible for collecting pertinent records of household expenses, medical costs, charitable contributions, and mortgage payments, which she brought to that meeting. She had a secretary's general working knowledge of business affairs, and from her own employment experience, a general day-to-day sense of her husband's corporation, including the nature and size of his business deals. She had sufficient grasp of tax forms to be able to assist her mother in preparing her tax returns. Based on these facts, the tax court concluded that taxpayer was sufficiently knowledgeable to recognize that further investigation was warranted.

In sum, the tax court therefore held the capital loss carryover failed the second "grossly erroneous" prong of the innocent spouse test, and the tax shelter deductions failed the third "lack of knowledge" prong. Since each of the four prongs of the innocent spouse test must be met, the tax court did not go on to consider the fourth prong— whether it would be inequitable to hold appellant jointly liable with her husband for the taxes and additions to tax owed to the United States. From this holding taxpayer appeals.

## DISCUSSION

A tax court's rulings are reviewed under the same standards as those applied to a district court's, that is, conclusions of law are examined *de novo*, while findings of fact are upheld unless clearly erroneous. *See Hayman v. Commissioner*, 992 F.2d 1256, 1260 (2d Cir.1993); *Park v. Commissioner*, 25 F.3d 1289, 1291 (5th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 673, 130 L.Ed.2d 606 (1994). A person claiming innocent spouse status under I.R.C. § 6013(e) has the burden of proving all its elements by a preponderance of the evidence. *See Stevens v. Commissioner*, 872 F.2d 1499, 1504 (11th Cir.1989); *Purcell v. Commissioner*, 826 F.2d 470, 473 (6th Cir.1987), *cert. denied*, 485 U.S. 987, 108 S.Ct. 1290, 99 L.Ed.2d 500 (1988). But since this provision of the tax law is remedial in nature, it is construed and applied liberally in favor of the person claim-

---

1. The 1984 amendment was made retroactive to all taxable years to which the Internal Revenue Code of 1954 applies for any taxable year that was still open as of July 18, 1984, the date of the enactment. H.R.Rep. No. 432, 98th Cong., 2d Sess., pt. 2, at 1503, *reprinted in* 1984 U.S.C.C.A.N. 697, 1144. Thus, this amendment governs this case even though some of the taxable years involved antedate the amendment.

ing its benefits. *See Perry v. Commissioner,* 63 T.C.M. (CCH) 2924, 2925, 1992 WL 90620 (1992) (quoting *Allen v. Commissioner,* 514 F.2d 908, 915 (5th Cir.1975)).

### I The Capital Loss Carryover

Of the four requirements a taxpayer must meet to be entitled to claim the status of an innocent spouse, the first prong—filing of a joint return—is met. Discussion therefore turns to the tax court's rulings on the second and third requirements. The second is the substantial understatement of tax because of one spouse's grossly erroneous claims. It was with respect to the capital loss carryover deduction that the tax court determined that the second, or "grossly erroneous" prong was not met.

In 1980 the Friedmans reported, but did not use, a short-term capital loss of $327,600, and in 1983 they claimed a carryover of $322,340 from that 1980 loss. The capital loss carryover deduction was apparently proper in 1983 when the Friedmans claimed it, that is to say, having not received the benefit of a deduction in 1980 when the capital loss occurred, the Friedmans were still entitled to it. Not until after a 1985 audit, which allowed $271,800 of the capital loss as a deduction in 1980, did that portion of the 1983 carryover become retrospectively unavailable. The tax court held—we think correctly on these facts—that the claimed 1983 deduction was not "grossly erroneous."

■ The Internal Revenue Code defines a "grossly erroneous" deduction as one "for which there is no basis in fact or law." I.R.C. § 6013(e)(2). In other words, the claim may be said to be "frivolous," "groundless," "fraudulent," or "phony." *Bokum v. Commissioner,* 992 F.2d 1136, 1142 (11th Cir.1993) (quoting *Stevens,* 872 F.2d at 1504 n. 6); *see also Shenker v. Commissioner,* 804 F.2d 109, 114 (8th Cir.1986), *cert. denied,* 481 U.S. 1068, 107 S.Ct. 2460, 95 L.Ed.2d 869 (1987); *Flynn v. Commissioner,* 93 T.C. 355, 364, 1989 WL 107095 (1989). The grossly erroneous requirement prevents an innocent spouse defense from applying to every disallowed claim simply because it has been disallowed. *Cf. Bokum,* 992 F.2d at 1142.

■ Whether a claim is grossly erroneous must be evaluated as of the time of filing of the tax return, *see Feldman v. Commissioner,* 20 F.3d 1128, 1135 n. 4 (11th Cir. 1994) (citing *Purcell,* 826 F.2d at 475); *see also Bokum,* 992 F.2d at 1142, which is consonant with the statutory purpose, since "innocence" is determined from a taxpayer's state of mind at the time of signing. Hence, if the claimed deduction had some basis in fact or law when it was made, so that a fully-informed spouse would likely have signed the return, granting innocent spouse status is probably inappropriate. Applying the innocent spouse defense in such circumstances would not protect one spouse from the overreaching or dishonesty of the other. *See Purcell,* 826 F.2d at 475.

Appellant relies on *Belk v. Commissioner,* 93 T.C. 434, 1989 WL 112763 (1989), for her contention that a claimed duplication of losses has no basis in fact or law, and therefore satisfies the "grossly erroneous" requirement. Such reliance is misplaced. The taxpayers in *Belk* had erroneously declared carryover losses from 1974 in their 1976 return. However, had they applied the carryover to offset the capital gains they realized in 1975, as they were required to do, no carryover would have been available for the 1976 tax year. In finding this claim grossly erroneous, the tax court noted that, *"even on the face of those returns that had been filed ...,* the carryover claimed on the 1976 return was without support." *Id.* at 443, 1989 WL 112763 (emphasis added).

■ The chronological sequence of events is otherwise here. There was nothing fraudulent, frivolous or incorrect regarding the carryover claim at the time the Friedmans signed their 1983 tax return. If taxpayer had been fully informed of the nature of the claim at that time, she would have been no less likely to join in the return than if she were not so informed. *See Purcell,* 826 F.2d at 475. The "innocent spouse" defense was designed to prevent the inequity of holding one spouse liable for the oversubtle financial machinations of the other; the defense was not intended to permit one spouse to escape liability for an apparently legitimate claim that turns out to have been disallowed.

The defense is all the more inappropriate here: both taxpayer and husband were equally in the dark as to the future status of their claim when they signed their 1983 return.

Hence, the tax court correctly held the 1983 carryover loss deduction was not grossly erroneous so as to qualify taxpayer for innocent spouse status.

## II The Tax Shelter Deductions

We pass now to those deductions that resulted from the computer equipment leasing shelter. According to the tax court, Friedman was not an "innocent spouse" with respect to these deductions because she failed to meet the third, or lack of knowledge prong of the defense. The computer leasing deal arose in 1983 when Philip Friedman sought information about tax shelters from Leon Baker, a New York tax attorney. Friedman invested in this tax shelter over the objections of his friend and accountant, Elwood Lerman. Lerman advised that the venture was risky, but as he stated in his deposition, "Phil being a gambler was willing to gamble here."

The gamble apparently paid off. From Friedman's initial investment of only $170,-000, he and his wife were able to claim net losses totaling $3,072,028 for the taxable years 1983 through 1985, plus carryback losses amounting to $422,769 for 1981 and 1982, for a grand total of nearly $3.5 million in tax deductions. When appellant first learned that the couple's joint tax liability was zero for 1983 because of the tax shelter, her response was a succinct "Wow."

■■■ Yet the fact that taxpayer knew of the existence of the tax shelter and the deductions it gave rise to does not itself establish that she cannot meet the lack of knowledge requirement of I.R.C. § 6013(e)(1)(C). In cases involving the omission of income, knowledge of the underlying transaction is sufficient to preclude innocent spouse status. *See Hayman,* 992 F.2d at 1261. Conversely, a spouse's lack of knowledge that a transaction produced income weighs in favor of an innocent spouse defense. *See Price v. Commissioner,* 887 F.2d

959, 963 n. 9 (9th Cir.1989). Nonetheless, applying the omission of income test to cases involving the disallowance of deductions would eviscerate the innocent spouse defense, since merely looking at the tax return informs the spouse of the transaction—such as a tax shelter—that gave rise to the deduction. *See id.; see also Erdahl v. Commissioner,* 930 F.2d 585, 589 (8th Cir.1991).

■■■ As a consequence, in deductions cases, we have adopted the Ninth Circuit's test, and require a taxpayer to establish that "she [or he] did not know and did not have reason to know that the deduction would give rise to a substantial understatement." *Hayman,* 992 F.2d at 1261 (citing *Price,* 887 F.2d at 963); *see also Erdahl,* 930 F.2d at 589 (adopting the *Price* test). *But see Bokum v. Commissioner,* 94 T.C. 126, 148–51, 1990 WL 17262 (1990) (knowledge of the underlying transaction all that is required both in omission and deduction cases), *aff'd on other grounds,* 992 F.2d 1132 (11th Cir.1993); *Park,* 25 F.3d at 1299 (declining to decide between the *Price* and *Bokum* standards).

Although the tax court recited the legal standard set forth in *Hayman,* its finding that appellant had "reason to know" of the substantial understatements of tax was clearly erroneous. Unlike the instant taxpayer, the spouse in *Hayman* was a highly-paid, college-educated vice-president and merchandising director employed by the well-known women's clothing chain, Ann Taylor. *Hayman,* 992 F.2d at 1258. In addition, she was a joint investor in the tax shelters at issue and had signed checks and documents relating to them. *Id.* at 1258, 1262. Taxpayer here is a housewife and unemployed former secretary with a high school education possessing only a rudimentary grasp of the simplest tax principles. Appellant did not actively participate in the equipment-leasing shelter beyond signing the joint tax forms in which the deductions at issue were claimed. Her acquaintance with her husband's business and her actions in collecting tax records relating to household accounts fall far short from establishing that she had the sophisticated financial insight necessary to assess the propriety of a complex international tax shelter.

Of course, appellant was not so unsophisticated or ignorant as to be unaware that the tax shelter was yielding rather than remarkable returns. As *Hayman* noted, "large deductions; such as tax shelter losses offsetting income from other sources and substantially reducing or eliminating the couple's tax liability, generally put a taxpayer on notice" that the tax return may contain substantial understatements. *Id.* at 1262. When the couple's tax liability suddenly plummeted to zero, and they were even able to claim relief from outstanding tax liability for previous years, she knew that the tax shelter made this possible.

 Nonetheless, from this it does not necessarily follow that she knew the shelter was improper. In the early 1980s it was a matter of common knowledge that wily investors could find legal ways and means of attaining spectacular tax benefits through cunning investment strategies. *See, e.g.,* Deborah Rankin, *Personal Finance: The Continued Appeal of Tax Shelters,* N.Y. Times, Aug. 8, 1982, § 3, at 13; *see also Foley v. Commissioner,* 1995 WL 15090 at *11, 69 T.C.M. (CCH) 1661, —— (1995) ("A reasonable interpretation of the term 'tax shelter' in the year at issue [1982] to a person unschooled in tax matters was that a tax shelter shelters income from tax."). Mere knowledge that the spouse has invested in a tax shelter resulting in substantial tax savings is accordingly, without more, insufficient to establish constructive knowledge of a substantial understatement of tax. *See, e.g., DeMartino v. Commissioner,* 51 T.C.M. (CCH) 1278, 1293, 1986 WL 22000 (1986).

 Under *Hayman,* 992 F.2d at 1262, the dramatic deductions on the Friedmans' 1983 to 1985 tax returns gave rise to a duty to enquire as to the propriety of such deductions. Appellant satisfied this duty when she asked her husband about them and was told that they resulted from a tax shelter and for her not to worry. *See Foley,* 1995 WL 15090 at *12–13, 69 T.C.M. (CCH) at —— (spouse satisfied duty by seeking assurances from husband who was an investment advisor, and by noting that the preparer had already signed the return); *Killian v. Commissioner,* 53 T.C.M. (CCH) 1438, 1441, 1987 WL 40412 (1987) (spouse satisfied duty by seeking assurances from husband, and hearing that the investment had been recommended by a qualified expert). Taxpayer knew that the returns in question had been prepared and signed by Lerman, a trusted friend and a competent accountant. She knew, too, that the tax shelter had been recommended by Baker, a tax expert whom she had heard about through her past employment in her husband's business.

 It was reasonable under the circumstances for appellant to rely on the financial experts advising her husband. The duty to enquire does not extend so far as to impose on a spouse the duty to seek advice from her own independent legal and financial advisers as to the propriety of her spouse's investments. *Cf. Pietromonaco v. Commissioner,* 3 F.3d 1342, 1344 (9th Cir.1993) (wife's reliance, in an omitted income case, on the belief that the return was done by a bookkeeper a factor in according innocent spouse status).

Further, it must be kept in mind that there is no indication taxpayer had any idea of how much her husband had actually invested in the tax shelter. Nor, apparently did she have any very clear idea of the size of his income, which was sporadic in its nature. She stated, "I knew he made big money when he made money." There was considerable evidence that Friedman was evasive about his finances, particularly with respect to his gambling. *See Pietromonaco,* 3 F.3d at 1346 (findings that husband maintained exclusive control over business affairs and was evasive with regard to gambling weigh heavily in favor of innocent spouse status).

*Hayman* listed four factors to consider in deciding whether "a reasonably prudent taxpayer in [the spouse's] position at the time she signed the return," 992 F.2d at 1261 (quoting *Price,* 887 F.2d at 965), should have known that the return contained a substantial understatement. A court should look at the (1) level of education and (2) the knowledge and experience in the family's business and financial affairs attained by the spouse claiming to be innocent; (3) whether the family's current standard of living is lavish compared to past levels of income and expen-

ditures; and (4) the conduct of the culpable spouse in concealing the true state of the family's finances from the "innocent" spouse.

■ In our view, applying those factors, taxpayer qualifies for innocent spouse status: (1) she had only a high school education, and lacked any special training in accounting or bookkeeping; (2) she had no active role in the family's financial affairs beyond managing ordinary household expenses; (3) the couple's lifestyle and standard of living remained relatively constant, but their debt load increased greatly during the tax years at question; and (4) her husband concealed the extent of his gambling addiction and the enormous amounts of money he had lost, that is, he deceived taxpayer as to the family's financial affairs. Moreover taxpayer reviewed the returns she signed as far as she was able, and under the circumstances took reasonable steps to enquire about the tax shelter deductions.

As a consequence, appellant established by a preponderance of the evidence that lack of knowledge required to claim innocent spouse protection under § 6013(e). It is undisputed that the tax shelter deductions were grossly erroneous within the meaning of § 6013(e)(1)(B). The only remaining question to be resolved is whether it would be inequitable to hold taxpayer jointly and severally liable with her husband for the couple's tax deficiencies. Because the tax court did not reach or decide this question, which we remand to it, a brief discussion of this issue is appropriate.

### III The Equities

■ The four requirements imposed by § 6013(e) on an innocent spouse claim are conjunctive, so that failure to prove any one of them bars a taxpayer from qualifying for relief under that section. *See, e.g., Park,* 25 F.3d at 1292; *Purificato v. Commissioner,* 9 F.3d 290, 293 (3d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1398, 128 L.Ed.2d 71 (1994). The tax court having found that Friedman's claim failed on other grounds did not consider the equities and made no findings with respect to the benefits taxpayer may have received from the understatements of tax.

■ The resolution of this issue depends upon a fact-intensive inquiry into the surrounding facts and circumstances. I.R.C. § 6013(e)(1)(D). Relevant factors include significant benefits received as a result of the understatements by the spouse claiming relief, any participation in wrongdoing on the part of the "innocent" spouse, and the effect of a subsequent divorce or separation. *See* S.Rep. No. 1537, 91st Cong., 2d Sess. (1970) (considering bill to amend the Internal Revenue Code of 1954), *reprinted in* 1970 U.S.C.C.A.N. 6089, 6092. Normal support, measured by the circumstances of the parties, is not considered a significant benefit for purposes of this determination. *Flynn,* 93 T.C. at 367, 1989 WL 107095. The magnitude of Friedman's gambling losses, which allegedly exceed the total tax deficiencies owed, would be a factor weighing heavily in favor of a finding that taxpayer did not personally benefit from the tax shelter. *See Pietromonaco,* 3 F.3d at 1348.

Because the tax court had no occasion to make findings on these questions, we must remand the case to it for further proceedings. *See, e.g., Shenker,* 804 F.2d at 115.

### CONCLUSION

Accordingly, we affirm the tax court insofar as it held taxpayer's "innocent spouse" defense failed with respect to the capital loss carryover claimed in 1983, but reverse insofar as it held taxpayer had failed to establish the requisite lack of knowledge with respect to the tax shelter deductions. The case is remanded to the tax court for further proceedings on taxpayer's claim of innocent spouse status consistent with this opinion.