T.C. Memo. 1996-239


UNITED STATES TAX COURT


HARVEY I. EPSTEIN AND ARLENE B. EPSTEIN, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 3530-95.                    Filed May 23, 1996.


On the facts, <u>Held</u>: P wife is an innocent spouse
within the meaning of sec. 6013(e), I.R.C., as to that
part of the deficiencies in income tax determined by
the Commissioner for 1976, 1977, and 1978, attributable
to the grossly erroneous items of P husband in those
years.


<u>Richard S. Kestenbaum</u> and <u>Bernard S. Mark</u>, for petitioners.

<u>William J. Gregg</u> and <u>Thomas J. Kerrigan</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

NIMS, Judge:  Respondent determined the following deficiencies in petitioners' Federal income tax and additions to tax:

| Year | Deficiency | Additions to Tax Sec. 6653(a) |
|------|------------|-------------------------------|
| 1976 | $49,828 | $2,491 |
| 1977 | 21,612 | 1,091 |
| 1978 | 12,453 | 623 |

Respondent also determined additional interest under section 6621(c) for each year as a result of substantial underpayments of income tax attributable to tax motivated transactions.

After concessions, the only remaining issue for decision is whether petitioner Arlene B. Epstein (petitioner or Arlene) is entitled to claim innocent spouse status under the provisions of section 6013(e) for each of the 3 years in issue (the relevant years).

All section references, unless otherwise specified, are to sections of the Internal Revenue Code in effect for the relevant years, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Some of the facts have been stipulated and are so found. The stipulation of facts and attached exhibits are incorporated herein by this reference.  Petitioners resided in Atlantic Beach, New York, when they filed their petition.

## FINDINGS OF FACT

Petitioners were married in 1959 and were still married at the time of trial. Throughout the relevant years, they resided in a house they bought in 1972 or 1973 for approximately $118,000 located at 109 Piermont Avenue, Hewlett Bay Park, New York.

Petitioner Harvey I. Epstein (Harvey) is a graduate of Dartmouth College. After graduation, he held several jobs, and was President of Dreyfus Sales Corporation for a period of time until 1970 or 1971, when he left Dreyfus and became a consultant. During the relevant years, Harvey was a general partner and investor in certain limited partnerships which generated substantial putative losses, which petitioners claimed as deductions on their return for the relevant years.

Harvey earned a salary from Harvey I. Epstein, Ltd., which was reflected on W-2 forms and reported on petitioners' tax returns for the relevant years. In 1978 Harvey also received a $21,867 salary from Pace Funding Corp., also reflected on a Form W-2, and duly reported on petitioners' 1978 return.

Arlene is a graduate of Barnard College. She also received a Master's degree in Education from Columbia, and a Master's degree in Humanities from Hofstra University. Arlene was employed as a teacher for 5 or 6 months shortly after her marriage, but stopped teaching when she became pregnant, and never returned to teaching. When her daughter attained age 10,

Arlene reentered the work force on a part-time basis.  Beginning in 1974, and thereafter, she sold advertising space in the South Shore Record, a local newspaper, for which she was paid commissions.  She also wrote a weekly drama review column for the same paper, for which she was paid nominal amounts.

At the end of each year, petitioners' accountant, Paul Kreindler (Kreindler), would ask Arlene to prepare and submit to him handwritten statements reflecting her travel and other business expenses, as well as Forms 1099 and/or Forms W-2 that she received from her employers (including, in 1978, Atl. Beach Tennis), for the purpose of preparing Schedule C to reflect Arlene's commissions, fees from writing, and any other income-earning activities.

Petitioners reported Schedule C income from Arlene's activities as follows:

| Year | Gross Receipts | Net Profit |
|------|---------------|-----------|
| 1976 | $5,715 | $3,017 |
| 1977 | 7,663 | 4,880 |
| 1978 | 7,724 | 4,941 |

Petitioner used the money she earned to purchase art works--mostly works on paper--and a fur jacket, because Harvey refused to give her money for these purposes.  Arlene also used money she received from her father to buy one or two things.  Arlene never received any large, unusual, or lavish gifts from her husband.

From the time Harvey was with Dreyfus, and throughout the relevant years, petitioners took an annual vacation at Dorado Beach in Puerto Rico. During the years Harvey was with Dreyfus Sales he traveled all over the world and Arlene often went with him, but they took only one vacation a year (the vacation at Dorado Beach) after that.

Petitioners did not maintain a joint checking account, and Harvey took most of the responsibility for paying bills, although he was often delinquent in doing so and, as a result, Arlene had to confront unpaid tradesmen from time to time. Arlene had one or two savings accounts where she deposited her earnings, but at no time had a checking account until 1978, when Harvey gave her one from which she could pay household expenses. Other than this, Arlene never maintained any of the family's banking or business records. Any time Arlene asked Harvey a question about their family's financial affairs, his stock reply was "not now".

Arlene knew that Harvey sold tax shelters but during the relevant years she was not privy to Harvey's business, which Harvey refused to discuss with her, and she never went to his office, where she was not welcome. In general, she thought a tax shelter was something like an IRA, and therefore legitimate.

Petitioner's tax returns for many years, including the relevant years, have been prepared by Kreindler, a C.P.A., who was at Dartmouth College with Harvey. Kreindler is also a social

friend of Harvey and Arlene. Arlene liked Kreindler and trusted him.

Harvey did not explain petitioners' tax returns to Arlene when he brought the returns for her to sign, which occurred sometimes early in the morning, when Arlene was not at her best due to a chronic illness, and sometimes late at night when she came in after reviewing a theater performance. Arlene would therefore call Kreindler when she had questions. Kreindler would assure Arlene that since he himself had signed the returns, Arlene could be assured that they were all right.

In 1986, petitioners sold their Hewlett Bay Park house for $725,000. It was Arlene's understanding that petitioners had to sell the house to "pay off taxes to the IRS". Of the proceeds, $305,000 were used to buy a house in Atlantic Beach, title to which Arlene insisted be placed in her name alone because she didn't know what Harvey's obligations were and she wanted to be protected against claims of his creditors. The increase in the value of the Hewlett Bay Park house from approximately $118,000, when purchased in 1973, to approximately $725,000, when sold in 1986, was unrelated to petitioners' putative tax savings from tax shelter deductions in the relevant years.

Arlene received the proceeds from the sale of certain property which her father had owned, and on which she had paid approximately $800 per year nominal real estate taxes for a

number of years, but of the amount she received she gave Harvey $34,000 "to pay IRS taxes". She also used most of the money to pay her father's nursing home expenses, and kept $30,000 which she used to rehab the Atlantic Beach house.

The art work which Arlene bought with her own earnings had a total cost over the years of less than $10,000. When Arlene applied for a home improvement loan on the Atlantic Beach house on August 5, 1987, the balance sheet supporting her application for a variable rate $70,000 loan reflected a $100,000 value for her art collection. The balance sheet also reflected a $150,000 value for personal property. Petitioners' household furnishings, including furniture, silverware, and china, were all items which Arlene received from her parents and grandparents (who were antique dealers), or which petitioners received as wedding presents.

## OPINION

Section 6013(e)(1) provides:

(e) Spouse Relieved of Liability in Certain Cases.--

> (1)  In general.  Under regulations prescribed by the Secretary, if--

>> (A)  a joint return has been made under this section for a taxable year,

>> (B)  on such return there is a substantial understatement of tax attributable to grossly erroneous items of one spouse,

(C) the other spouse establishes that in signing the return he or she did not know, and had no reason to know, that there was such substantial understatement, and

(D) taking into account all the facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such substantial understatement,

then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent such liability is attributable to such substantial understatement.

(In 1984, section 424(a) of Pub. L. 98-369, 98 Stat. 801, 803, amended the Code to provide that current section 6013(e) is applicable to all taxable years to which the Internal Revenue Code of 1954 applies, which includes 1976, 1977, and 1978.)

Respondent concedes that petitioner satisfies the section 6013(e)(1)(A) and (B) and 6013(e)(4) elements of the innocent spouse requirements for the relevant years. (Section 6013(e)(4) relates to understatements exceeding a specified percentage of the putative innocent spouse's income.) Therefore, the two elements of the innocent spouse requirements remaining in dispute are whether petitioner had the kind of knowledge referred to in subparagraph (C), and whether under the facts of this case there would be the type of inequity referred to in subparagraph (D). In reaching our conclusions as to Arlene's liability we are substantially aided by guidelines provided by the recent decisions of the U.S. Court of Appeals for the Second Circuit

(the court to which this case would ordinarily be appealed) in
Friedman v. Commissioner, 53 F.3d 523 (2d Cir. 1995), affg. in
part, revg. in part and remanding in part T.C. Memo. 1993-549;
and Hayman v. Commissioner, 992 F.2d 1256 (2d Cir. 1993), affg.
T.C. Memo. 1992-228.

In Friedman v. Commissioner, 53 F.3d at 525, the Court of
Appeals stated the issue in that case in a way that also
succinctly states the issue in this case, to wit:  whether an
individual is entitled to assert the innocent spouse defense to
avoid joint tax liability for tax transactions of which he or she
was aware but did not thoroughly understand.  We take the liberty
of quoting at some length from the Friedman case because we
believe it appropriately points the way to a resolution of our
case:

> The "innocent spouse" exemption was not designed to
> protect willful blindness or to encourage the
> deliberate cultivation of ignorance.  Extravagant tax
> savings may alert even a financially unsophisticated
> spouse to the possible improprieties of a tax scheme.
>
> Nevertheless, we recognize that in the bewildering
> world of tax shelter deductions, few experts, let alone
> laypersons, easily discern the difference between a
> fraudulent scheme and an exceptionally advantageous
> legal loophole in the tax code.  There is a common
> sense limit we think to a spouse's duty of
> investigation in those circumstances where the more
> financially sophisticated spouse invokes the support of
> tax experts and accountants in asserting an improper
> deduction.  The wife claiming status as an innocent
> spouse under such circumstances must persuade the fact-
> finder that she had no reason to suspect that what her
> more financially sophisticated husband did was wrong.
> In short, an innocent spouse is one who despite having

made reasonable efforts to investigate the accuracy of the joint return remains ignorant of its illegitimacy. [Id.]

In Friedman v. Commissioner, supra, the husband was a financially successful mortgage broker, and the wife was a widowed mother of two who, prior to the couple's marriage, had been the future husband's secretary. The Court of Appeals considered the couple's lifestyle as one which could be characterized as "lavish", made possible by the husband's business success. The substantial understatements of tax on the returns in question resulted from the husband's participation in a computer-leasing transaction that the Court described as a "complex international tax shelter". Friedman v. Commissioner, supra at 530. The wife was aware of the transaction, but did not understand it and because of her husband's business acumen assumed it to be legitimate.

The Court of Appeals in the Friedman case applied the test enunciated in Hayman v. Commissioner, supra, that required a taxpayer to establish that she or he did not know and did not have reason to know that the deduction would give rise to a substantial understatement. Friedman v. Commissioner, supra at 530.

The Court of Appeals in Hayman listed four factors to consider in deciding whether a reasonably prudent person in the "innocent" spouse's position at the time she signed a return

should have known that the return contained a substantial understatement.  Hayman v. Commissioner, 992 F.2d at 1261. According to Hayman, a court should look at (1) The level of education and (2) the knowledge and experience in the family's business and financial affairs attained by the spouse claiming to be innocent; (3) whether the family's current standard of living was lavish compared to past levels of income and expenditures; and (4) the conduct of the culpable spouse in concealing the true state of the family's finances from the "innocent" spouse. Friedman v. Commissioner, supra at 531-532.

We have made detailed findings of fact, many of which encompass the Hayman case factors, and no useful purpose is served by rehashing these facts in detail.  But in our view, when the Hayman four factors are applied in our case, petitioner satisfies the requirement of subparagraph (C) that in signing the return she did not know, and had no reason to know, that there were substantial understatements.

(1)  Petitioner, while well educated, devoted most of her time to her interest in the arts--graphic arts and the theater-- and her work experience as a space salesman for a small, local newspaper did nothing to fit her for an understanding of business matters on anything like a sophisticated level.

(2)  Petitioner had no role whatever in the family's financial affairs beyond, at most, making cash payments for

household expenses.  Harvey simply refused to discuss finances with petitioner, and systematically excluded her from his business affairs, at least the business affairs which he conducted after he left Dreyfus in 1971, well before the relevant years.  Whatever petitioner spent to indulge her own taste for art and afford herself a few small luxuries, she paid for out of her own meager earnings.  She in fact gave Harvey money to pay "IRS taxes" out of money she received from her father, and used additional funds from that source to rehab the smaller house into which petitioners were forced to move after tax deficiencies required them to sell their larger, more comfortable house in Hewlett Park.

(3)  Nothing in the record would lead one to believe that petitioners' lifestyle was lavish either before, during, or after the relevant years.  While petitioner conceded that Hewlett Bay Park is considered to be a wealthy area, she also testified that the couples' house on Piermont Avenue was at the "low end".  We perceive no reason to question the truthfulness of her testimony on this point, and respondent's counsel did not challenge it.

(4)  Harvey and his friend, Kreindler, repeatedly kept from Arlene the truth about the tax shelter deductions that were being claimed on the couple's returns for the relevant years, and systematically refused to explain the returns to Arlene or give

any meaningful answers to any questions she from time to time asked.

As stated in Friedman, the fact that the innocent spouse-taxpayer knows of the existence of a tax shelter, and the deductions it hopefully gives rise to, does not itself establish that she cannot meet the lack of knowledge requirement of section 6013(e)(1)(C). Friedman v. Commissioner, supra at 530. In the case before us, petitioner testified that she knew that Harvey was in the business of selling tax shelters, but was unaware that he was investing in them himself. While this profession of lack of knowledge is of course self-serving, petitioner's additional testimony rings true, namely, that she was led to believe, at least during the relevant years, that tax shelters were on the up and up and were, like IRAs, a legitimate way to save taxes. In the era that encompassed the years 1976-1978, individuals far more financially sophisticated than petitioner let themselves believe that the tooth fairy in the guise of a tax shelter would bring them substantial wealth, at little or no cost to themselves, which would be entirely paid for out of the National fisc as tax savings. We, therefore, hold that petitioner had no reason to know that the returns for the relevant years contained substantial understatements of tax.

To meet the fourth requirement imposed by section 6013(e) to validate an innocent spouse claim, the taxpayer must establish

that it would be inequitable to hold her liable for the substantial understatement-related deficiency. Sec. 6013(e)(1)(D). One of the factors to be considered is whether the "innocent" spouse received significant benefits as a result of the understatements. Friedman v. Commissioner, 53 F.3d at 532; sec. 1.6013-5(b), Income Tax Regs. Normal support, measured by the circumstances of the parties, is not considered a significant benefit for purposes of this determination. Id., Flynn v. Commissioner, 93 T.C. 355, 367 (1989). There is no evidence that petitioner received any unusual benefit from the tax shelter deduction. Harvey controlled the family finances, and did not allow petitioner to have access to the couple's money beyond that which he, Harvey, chose to give her. Even if part of the understatements did inure to petitioner's benefit, such benefit did not exceed normal support.

At the trial respondent attempted to attach significance to the fact that in 1986 petitioners sold their Hewlett Bay Park house for $725,000, which they had purchased in 1973 for approximately $118,000. Since the record contains no indication that the house was in any way enhanced by the money generated by tax savings in the relevant years, we cannot attribute a tax generated benefit to Arlene in connection with the increased value of the house. Increases in values merely through inflation, which in this case would also include not only the

house but also the house furnishings and the art collection, have no apparent significance in the determination of whether petitioner received any benefit from the understatement.

Another factor to be considered is whether the spouses have been divorced. Flynn v. Commissioner, supra at 367; sec. 1.6013-5(b), Income Tax Regs. Given the couple's uneasy relationship throughout their marriage, we do not attach particular significance to the fact that they have remained together. Petitioner characterized her marriage as not one "made in heaven", and testified that because of her chronic health problem, which appears to have persisted throughout most of her adult life, she "couldn't think of leaving, because how was I going to take care of myself?" Petitioner first discovered in 1984 that Harvey had been "sheltering" his income in the relevant years. Other recent cases have considered the impact and reliability of a spouse's promise to pay any tax deficiencies resulting from grossly erroneous items. See, e.g., Friedman v. Commissioner, T.C. Memo. 1995-576 (on remand from 53 F.3d 523); Stiteler v. Commissioner, T.C. Memo. 1995-279; Foley v. Commissioner, T.C. Memo. 1995-16. But in the instant case the record only reveals a struggle by both spouses to pay unidentified Federal tax bills, with Arlene contributing $34,000 at one point from money received from her father, and the couple selling their comfortable home to raise cash with which to pay

other income tax bills.  Thus, the fact that the couple was not divorced or separated appears at best to be a neutral factor in determining the inequity question, and we afford it no negative significance.

Taking into account all the facts and circumstances, we conclude and hold that it would be inequitable to hold petitioner liable for the substantial understatements in the relevant years.

For the foregoing reasons, we hold that petitioner Arlene Epstein is an innocent spouse within the meaning of section 6013(e) as to that part of the deficiencies in income tax for the relevant years attributable to the grossly erroneous items of her spouse, petitioner Harvey Epstein.

Decision will be entered

under Rule 155.