T.C. Memo. 1996-477


UNITED STATES TAX COURT


GERALD JACOBY AND ARLENE JACOBY, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 7073-87.                    Filed October 23, 1996.


    <u>Martin Rosen</u> and <u>L. William Fishman</u>, for petitioner Gerald
Jacoby.

    <u>Ira B. Stechel</u> and <u>Thomas J. Fleming</u>, for petitioner Arlene
Jacoby.

    <u>Diane Mirabito</u> and <u>Gary Bornholdt</u>, for respondent.



        MEMORANDUM FINDINGS OF FACT AND OPINION

    CLAPP, <u>Judge</u>:  Respondent determined deficiencies in
petitioners' Federal income taxes as follows:

| Year | Deficiency |
|------|-----------|
| 1978 | $93,098 |
| 1979 | 84,284 |
| 1980 | 28,675 |

Respondent also determined that petitioners are liable for increased interest pursuant to section 6621(c) (formerly section 6621(d))[1] for the taxable years 1978, 1979, and 1980.

After concessions by the parties, the sole issue for decision is whether Arlene Jacoby (petitioner) is entitled to relief as an innocent spouse for the taxable years 1978, 1979, and 1980.  We hold that she is so entitled.  Petitioner Gerald Jacoby (Gerald) has reached a settlement with respondent regarding his liabilities for all taxable years.

All section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, unless otherwise indicated.

---

[1]     Sec. 6621(d) was redesignated as sec. 6621(c) by sec. 1511(c)(1)(A) of the Tax Reform Act of 1986, Pub. L. 99-514, 100 Stat. 2085, 2744, and repealed by sec. 7721(b) of the Omnibus Budget Reconciliation Act of 1989 (OBRA 89), Pub. L. 101-239, 103 Stat. 2106, 2399, effective for tax returns due after Dec. 31, 1989, OBRA 89 sec. 7721(d), 103 Stat. 2400.  The repeal does not affect the instant case.  For convenience, we refer to this section as sec. 6621(c).   The annual rate of interest under sec. 6621(c) for interest accruing after Dec. 31, 1984, equals 120 percent of the interest payable under sec. 6601 with respect to any substantial underpayment attributable to tax-motivated transactions.

FINDINGS OF FACT

Some of the facts are stipulated and are so found.  We incorporate by reference the stipulation of facts and attached exhibits.

Petitioner resided in Old Westbury, New York, when the petition in this case was filed.

Petitioner married Gerald in 1963.  They separated in April 1984 and obtained a divorce in 1992.

Petitioner graduated from high school and completed two semesters of college, where she majored in child psychology. Following her marriage, petitioner worked as a receptionist, but she discontinued her job when their first child, Douglas, was born in 1966.  Their second child, Karen, was born in 1968.  From the time of Douglas' birth through the years in issue, petitioner was a housewife and mother.  Petitioner has no training or experience in business matters.

When Gerald married petitioner, he worked at his family's auto parts distribution business.  In the early 1960's, Gerald organized Ajac Transmission Parts Corp. (Ajac), which manufactured and repackaged automotive automatic transmission parts.  Gerald worked hard to make Ajac a success, and by the mid-1970's, Ajac employed 30 to 50 people and had nationwide sales of $3 million to $5 million.  Gerald also owned other businesses during the years in issue.

Petitioner had no role in Gerald's businesses. Petitioner never went to Gerald's business offices, except on one occasion when he was redecorating. Petitioner never attended Christmas parties held for Gerald's employees, nor was she invited. Gerald never discussed with petitioner the details or the finances of his businesses. Gerald had no interest in discussing business matters with petitioner. He considered petitioner responsible for tending the house and caring for the children. Gerald considered himself responsible for all matters related to his businesses and the family's finances.

Petitioner managed a joint household checking account, to which Gerald contributed $2,000 to $3,000 monthly, plus an amount for the monthly mortgage payment. From this account, petitioner paid the household expenses, such as food and utility bills. This was petitioner's sole involvement in the family's finances.

Petitioner and Gerald (the Jacobys) led an affluent lifestyle for several years up to and during the years at issue. In 1973, one of Gerald's businesses acquired a pleasure boat that petitioner occasionally used with Gerald. They owned a residence located on 4 acres, which they purchased for $215,000 in 1976. They had a housekeeper and took family vacations, and the children attended summer camp.

In 1979, Gerald acquired a condominium in Florida that he used in connection with his business interests. Petitioner and the Jacoby children visited the Florida condominium twice in

1980, for the Easter and Christmas holidays. Petitioner also used the Florida condominium on a couple of vacations while the children were out of school.

Petitioner's lifestyle did not change during the years in issue. The Jacobys continued to live in the house they acquired in 1976. There were minimal increases in the family's savings, and the amount of petitioner's monthly allowance received from Gerald did not change. Neither petitioner nor the children received any large gifts from Gerald during the years in issue.

In the early 1980's, the Jacobys began to live apart. In 1984, Gerald moved out of the marital residence permanently. Thereafter, Gerald experienced financial difficulties and business failures. Gerald sold his business interests to his employees in 1984 and 1985, and petitioner received no proceeds from the sale. Gerald sold the Florida condominium in 1985, and none of the proceeds of the sale went to petitioner.

In 1985, Gerald told petitioner that he was having serious financial problems and had incurred a great deal of debt. About that same time, petitioner learned that tax liens had been filed against their home. In 1986, Gerald sold the boat, and none of the proceeds of the sale went to petitioner.

In May 1987, the Jacobys entered into a separation agreement under which petitioner received ownership of the marital residence. In exchange for ownership of the marital residence, petitioner waived her rights to alimony, spousal support, and

spousal maintenance.  Pursuant to the separation agreement, Gerald transferred full ownership of the marital residence to petitioner, and petitioner incurred a $400,000 home equity loan (home equity loan), using the residence as collateral.  Gerald received $40,000 of the proceeds from the home equity loan, and petitioner used about $250,000 of the proceeds from the home equity loan to pay the tax liabilities attributable to income tax deficiencies for the taxable years 1975, 1976, and 1977.  Those deficiencies are not at issue in this case, but they are discussed below.

In the separation agreement, Gerald agreed to pay petitioner $5,000 per month to amortize the home equity loan until the loan was repaid.  Gerald reneged on this agreement after making six monthly payments of $5,000.  Gerald also reneged on his obligation to pay a portion of the children's college expenses, insurance, and other expenses.  Petitioner's divorce attorney advised her not to file suit against Gerald in an attempt to enforce the separation agreement, because the divorce attorney felt that Gerald had no resources or income and was judgment proof.

In 1988, petitioner sold a portion of the land on which her home was located.  After the sale, petitioner discovered that taxes for the taxable year 1984 remained unpaid, so she used approximately $200,000 of the proceeds to satisfy the tax

liability.  She also used the proceeds for living expenses and Karen's college tuition.

Petitioner filed in bankruptcy after the lender of the home equity loan threatened to foreclose on her residence.  The bankruptcy proceedings were terminated when petitioner found a buyer for her residence.

Tax Return Preparation

Stanley J. Gelda (Gelda) prepared the Jacobys' U.S. Individual Income Tax Returns (Forms 1040) for the years in issue.  Gelda has been a certified public accountant since 1963, and he has prepared tax returns for individuals and businesses since 1954.

Gelda has had a long affiliation with the Jacoby family. Gerald's parents retained Gelda's firm to provide tax and accounting services in the 1960's when they organized their automobile parts distributorship.  When Gerald formed Ajac, Gelda handled Ajac's tax and accounting work.  As Gerald formed or acquired more businesses, Gelda provided accounting services for them as well.

Gelda also advised the Jacobys in personal tax matters, and he prepared the Jacobys' income tax returns from 1963 through 1986.  The Jacobys filed joint income tax returns for the taxable years 1975-86.  (We have concluded that the returns for 1978 and 1980 were joint returns.)  The record is not clear as to their filing status in prior years.

Gelda's method for preparing the Jacobys' income tax returns did not vary.  Gerald would meet with Gelda, and they would assemble the information necessary to prepare the Forms 1040.  Petitioner would assemble charitable contribution receipts and mortgage payment statements and give them to Gerald.  This was petitioner's only participation in the preparation of the Forms 1040.  After preparing the returns, Gelda would sign them as preparer and then forward the return to Gerald to sign and file.

Petitioner knew that Gelda had a longstanding professional relationship with Gerald and his family, and she believed that Gelda was a cautious return preparer.  Petitioner had known Gelda personally since she married Gerald, and she trusted Gelda entirely.  Petitioner considered Gelda an expert in tax matters and had no reason to question his judgment.

For the taxable years 1978, 1979, and 1980, the Jacobys filed Forms 1040, and each Form 1040 indicated a filing status of "married filing joint return".

Gelda prepared the 1978 Form 1040, signed it, and forwarded it to Gerald to sign and file.  Gerald signed petitioner's name on the 1978 Form 1040, and petitioner never reviewed it. Petitioner did not know that Gerald had placed her signature on the 1978 Form 1040, and Gerald never discussed with petitioner his having signed her name.

Gelda prepared the 1979 Form 1040, signed it, and forwarded it to Gerald to sign and file.  Gerald gave the 1979 Form 1040 to petitioner to sign, and he assured her that it had been prepared properly.  Petitioner noticed that Gelda had signed the 1979 Form 1040, and she believed that Gelda had prepared it properly.  Before signing the 1979 Form 1040, petitioner reviewed it as best she could.

Gelda prepared the 1980 Form 1040, signed it, and forwarded it to Gerald to sign and file.  Gerald signed petitioner's name on the 1980 Form 1040, and petitioner never reviewed it.  Petitioner did not know that Gerald had placed her signature on the 1980 Form 1040, and Gerald never discussed with petitioner his having signed her name.

Tax Shelter Investments

Gerald invested in tax shelters as early as 1975.  As a result of Gerald's tax shelter investments, respondent determined tax deficiencies against the Jacobys for the taxable years 1975, 1976, and 1977 (the 1975-77 deficiencies) in the amounts of $26,334.39, $62,354.56, and $76,863.49, respectively.  None of these deficiencies is at issue in this case.

The 1975-77 deficiencies were attributable to Gerald's investments in Hawk Mining Co., Ltd. (Hawk Mining), Mason Coal Program (Mason Coal), and T.A.B. Production Co. (T.A.B. Production).  Gerald reinvested the tax savings derived from the 1975, 1976, and 1977 tax shelter investments in his businesses.

Respondent assessed the 1975-77 deficiencies in income tax. The 1975-77 deficiencies remained unpaid until 1987, when petitioner paid them with the proceeds of the home equity loan. Gerald paid no portion of the 1975-77 deficiencies.

During the years in issue, Gerald invested in five tax shelters that Steven Gurian (Gurian), Gerald's financial adviser, had recommended to him. Ajac also invested in the tax shelters Gurian recommended. Gerald reinvested the tax savings derived from the 1978, 1979, and 1980 tax shelter investments in his businesses.

Petitioner had met Gurian once, at a social event, and she knew that Gurian was a financial adviser. Petitioner did not know that Gurian sold tax shelters, and she never discussed business or financial matters with Gurian.

Gerald discussed each tax shelter investment with Gelda. Gelda reviewed the tax shelters and concluded that the shelters were solely tax motivated with no opportunity for economic gain, and he advised Gerald not to invest in the tax shelters. Gelda came to a definitive conclusion that each of the tax shelters was solely tax motivated.

Gelda never discussed the tax shelters or Gerald's businesses with petitioner. Gelda believed that petitioner had no knowledge of the tax shelter investments.

Petitioner did not know that Gerald had invested in the tax shelters, and she had no ownership interest in them. She also did not know that Ajac had invested in the tax shelters.

Petitioner was not present when the tax shelters were discussed, and she never saw the tax shelter documents. Gerald never discussed the tax shelter investments with her. When petitioner noticed the amount of mail they received from the Internal Revenue Service for prior tax years, she asked Gerald what was going on. Gerald told her that Gelda was the accountant, everything was under control, and she should not worry about it.

Gerald invested in the following tax shelters: Hawk Mining, Masada Press, Ltd., Mason Coal, Power Control Sales Corp. (Power Control), and T.A.B. Production.

For the taxable year 1978, Gerald claimed deductions of $3,956, $49,472, $5,203, and $24,144 attributable to the investments in Hawk Mining, Masada Press, Ltd., Mason Coal, and T.A.B. Production, respectively. Gerald claimed an investment tax credit of $42,800 attributable to the investment in Masada Press, Ltd., for the taxable year 1978.

For the taxable year 1979, Gerald claimed deductions of $3,853, $60,000, and $32,396 attributable to the investments in Hawk Mining, Masada Press, Ltd., and Power Control, respectively. Gerald claimed an investment tax credit of $28,600 for the taxable year 1979, but the record does not make clear to which

investment this tax credit relates. When petitioner reviewed the 1979 Form 1040, the deductions related to the tax shelters had no meaning to her, and she did not understand the financial consequences of the tax shelter investments.

For the taxable year 1980, Gerald claimed a deduction of $52,110 attributable to the investment in Power Control.

Respondent disallowed the aforementioned deductions and investment tax credits attributable to the tax shelters, and the Jacobys filed a petition in this Court.

In 1992, Gerald and respondent entered into a stipulation of settlement. For the taxable year 1978, Gerald conceded that he was not entitled to any loss attributable to Hawk Mining, Mason Coal, or T.A.B. Production. Gerald also conceded that he was not entitled to the investment tax credit claimed for 1978. Respondent conceded that Gerald was entitled to a $40,000 loss resulting from Masada Press, Ltd., that amount being equal to his cash investment. For the taxable year 1979, Gerald conceded that he was not entitled to any loss attributable to Hawk Mining, or Masada Press, Ltd. Gerald also conceded that he was not entitled to the investment tax credit claimed for 1979. Respondent conceded that Gerald was entitled to a $35,617 loss resulting from Power Control. For the taxable year 1980, Gerald conceded that he was not entitled to any loss attributable to Power Control. Gerald conceded that the deficiencies for the taxable

years 1978, 1979, and 1980 were subject to the increased rate of interest pursuant to section 6621(c).

Respondent assessed deficiencies against Gerald for his taxable years 1978, 1979, and 1980 in the amounts of $65,412, $60,463, and $28,675, respectively, plus interest computed pursuant to section 6621(c). Gerald paid nothing on the assessed amounts and thereafter filed in bankruptcy and was discharged from liability on the assessments.

Petitioner had no representation separate from Gerald's in connection with respondent's audit of the Forms 1040 for the taxable years 1978, 1979 or 1980, nor did she have separate representation at the time the petition in this case was filed.

OPINION

Petitioner concedes that she is not entitled to any of the losses or investment tax credits attributable to the tax shelters and disallowed by respondent in the notice of deficiency. Petitioner also concedes that the deficiencies at issue are subject to the increased rate of interest pursuant to section 6621(c).

Spouses filing a joint return are jointly and severally liable for the tax arising therefrom. Sec. 6013(d)(3). The innocent spouse rule permits a spouse to avoid joint and several liability in certain cases. Sec. 6013(e). For petitioner to qualify as an innocent spouse, it must be established: (1) That a joint return was filed for each year in issue; (2) that there

were substantial understatements of tax and that the understatements were attributable to grossly erroneous items of Gerald; (3) that, in signing the returns, she did not know, or have reason to know, of the substantial understatements; and (4) that taking into account all the facts and circumstances, it would be inequitable to hold her liable for the deficiencies. Sec. 6013(e)(1)(A) through (D). Petitioner has the burden of proving that she had met each requirement of section 6013(e). Rule 142(a); Russo v. Commissioner, 98 T.C. 28, 31-32 (1992). A failure to meet any one of the requirements will preclude petitioner from relief. Stevens v. Commissioner, 872 F.2d 1499, 1504 (11th Cir. 1989), affg. T.C. Memo. 1988-63; Bokum v. Commissioner, 94 T.C. 126, 138 (1990), affd. 992 F.2d 1132 (11th Cir. 1993). Section 6013(e)(3) states the numerical prerequisite to determine whether a substantial understatement exists, and section 6013(e)(4) concerns whether such understatements exceed a specified percentage of the putative innocent spouse's income. Respondent concedes that petitioner satisfies the requirements of section 6013(e)(3) and (4). The parties agree that there were substantial understatements of tax attributable to items of Gerald for each of the years in issue.

We first decide whether the Jacobys filed a joint return for each of the taxable years 1978 and 1980. Whether petitioner intended to file a joint return is a question of fact. O'Connor v. Commissioner, 412 F.2d 304, 309 (2d Cir. 1969), affg. in part

and revg. in part T.C. Memo. 1967-174.  If petitioner did not file a joint income tax return for the taxable years 1978 and 1980, she is not liable for the deficiencies determined by respondent, and the question of petitioner's innocent spouse status becomes moot.  See Davenport v. Commissioner, 48 T.C. 921 (1967).  The parties agree that the Jacobys filed a joint return for the taxable year 1979.

Respondent concedes that petitioner did not sign the Forms 1040 for the 1978 and 1980 taxable years.  Thus, respondent must produce some evidence that petitioner intended to file a joint return with Gerald for those years.  O'Connor v. Commissioner, supra at 309.

Petitioner filed a joint income tax return for each of the taxable years 1975-77, 1979, and 1981-86.  This pattern is some evidence that petitioner intended to file a joint return in 1978 and 1980.  See Estate of Campbell v. Commissioner, 56 T.C. 1, 12-13 (1971).  Petitioner assembled charitable contribution receipts and mortgage payment statements and gave them to Gerald, who in turn gave the documents to Gelda.  Petitioner's cooperative effort in assembling these documents and her delivering them to Gerald for the sole purpose of the preparation of income tax returns indicates that petitioner intended to file joint returns for the taxable years 1978 and 1980.  See Sharwell v. Commissioner, 419 F.2d 1057, 1059-1060 (6th Cir. 1969), vacating and remanding on another issue T.C. Memo. 1968-89.  From 1963

through the years in issue, Gerald worked with Gelda in preparing the Jacobys' tax returns. There existed a general understanding between petitioner and Gerald that Gerald would handle the family business and tax matters. We find the understanding between petitioner and Gerald is evidence that petitioner intended to file joint returns for 1978 and 1980. We conclude that petitioner intended to file, and did file, joint returns for the taxable years 1978 and 1980.

We next decide whether the understatements of tax were attributable to grossly erroneous items. A deduction for which there is no basis in fact or law is grossly erroneous. Sec. 6013(e)(2). A deduction has no basis in fact if the expense for which the deduction is taken was not made, and a deduction has no basis in law if the expense is not deductible under well-established legal principles, or if no substantial legal argument can be made to support its deductibility. Russo v. Commissioner, supra at 32; Douglas v. Commissioner, 86 T.C. 758, 762-763 (1986).

We evaluate whether a claim is grossly erroneous as of the time of filing of the tax return. Friedman v. Commissioner, 53 F.3d 523, 529 (2d Cir. 1995), revg. in part and remanding T.C. Memo. 1993-549. Petitioner cannot rely on respondent's disallowance in the statutory notice or her inability to substantiate the losses to prove the lack of basis in fact or law. Douglas v. Commissioner, supra at 763. Petitioner's

concession that respondent's adjustments for the losses are correct is not sufficient to establish that there was no basis in fact or law for the claimed losses. Purcell v. Commissioner, 86 T.C. 228, 239 (1986), affd. 826 F.2d 470 (6th Cir. 1987). Respondent concedes that the deduction related to T.A.B. Production is grossly erroneous.

In the stipulation of settlement entered into between respondent and Gerald, respondent allowed Gerald a deduction of $40,000 attributable to Masada Press, Ltd., for the taxable year 1978 and a deduction of $35,617 attributable to Power Control for the taxable year 1979. Respondent argues that where a deduction was allowed in a settlement, it necessarily follows that there is some basis in fact or law for that deduction.

Respondent's agreement to a compromise settlement may suggest that the deductions claimed on a return were less than grossly erroneous. See, e.g., Crowley v. Commissioner, T.C. Memo. 1993-503; Anthony v. Commissioner, T.C. Memo. 1992-133; Neary v. Commissioner, T.C. Memo. 1985-261. However, parties consider a myriad of factors during settlement negotiations, and we attach little weight to the stipulation of settlement in this case. The naked stipulation of settlement gives no insight into which factors influenced respondent's settlement position. The settlement allowed deductions to Gerald for his out-of-pocket expenses in 1978, and presumably for his out-of-pocket expenses in 1979, and no deduction in 1980. The out-of-pocket expense

settlement has been entered into by respondent in numerous tax shelter cases. The stipulation of settlement does not support the inference that respondent asks this Court to draw.

The promotional materials for each tax shelter highlight and discuss at length the tax benefits derived from the investments. Each of the tax shelters provided for deferred consideration using promissory notes that were primarily nonrecourse and secured by the property upon which the tax shelter was built.

We also consider significant Gelda's conclusions, reached during the years at issue, as to each of the tax shelter investments. Gelda was an experienced accountant who had been a certified public accountant since 1963. He reviewed the tax shelter documents and attended several of the meetings with Gerald and Gurian. Gelda concluded that each of the tax shelters had no economic substance. Gelda concluded that the tax shelters were solely tax motivated and provided no opportunity for economic gain. Gelda's conclusion was not equivocal. Gelda advised Gerald not to invest in the tax shelters, but Gerald rejected Gelda's advice. We find that the understatements of tax were attributable to grossly erroneous items.

Petitioner must establish that she did not know and did not have reason to know that the deductions would give rise to a substantial understatement. Friedman v. Commissioner, supra at 530. Large deductions on a tax return may give rise to a duty to inquire as to the propriety of such deductions. Hayman v.

Commissioner, 992 F.2d 1256, 1262 (2d Cir. 1993), affg. T.C. Memo. 1992-228. As noted below, Gerald assured petitioner that everything was in order, and she relied on Gelda's reputation as return preparer.

We look at the following four factors to determine whether a reasonably prudent taxpayer in petitioner's position should have known that the return contained a substantial understatement: (1) Petitioner's level of education; (2) petitioner's knowledge and experience in the family's business and financial affairs; (3) whether the family's standard of living during the years in issue was lavish compared to past levels of income and expenditures; and (4) the conduct of the culpable spouse in concealing the true state of the family's finances from petitioner. Friedman v. Commissioner, supra at 531-532.

Petitioner graduated from high school and completed two semesters of college. She had no training or experience in business matters. Petitioner has worked in the home since 1966.

Petitioner's knowledge of the family's financial affairs and Gerald's business affairs was minimal. Petitioner paid household expenses from a joint checking account, and that was her only involvement in the family's financial affairs. Petitioner had no voice in the Jacobys' investments, and she was not aware that Gerald had invested in tax shelters. She had no role in Gerald's businesses, and he would not discuss his business activities with her.

Petitioner enjoyed a comfortable lifestyle during the years in issue, but that lifestyle was consistent with that of prior years. The tax savings from the tax shelter investments were not used to better petitioner's standard of living; rather, those tax savings flowed into Gerald's business activities. Gerald subsequently sold his business activities, and petitioner received no benefits from those sales.

Gerald generally concealed his business activities and tax shelter investments from petitioner. Petitioner did not sign the 1978 or the 1980 Form 1040. Petitioner signed the 1979 Form 1040 after being instructed to do so by Gerald. Gerald considered all matters related to his businesses and the family finances to be his domain. Gerald did not discuss any investments with petitioner, including the tax shelter investments, and he had no interest in discussing those matters with her. Gerald reinvested the tax savings derived from the tax shelter investments in his businesses, and he did not discuss this with petitioner. Petitioner was not present when Gerald met with Gurian or Gelda. Gelda advised Gerald not to invest in the tax shelters, but Gerald never shared Gelda's advice with petitioner.

Petitioner satisfied any duty she may have had to inquire as to the propriety of the tax shelter deductions. Petitioner reviewed the 1979 Form 1040 as best she could. She saw that Gelda already had signed the Form 1040, which led her to believe that the Form 1040 had been prepared properly. Petitioner had

known Gelda for many years, trusted him, and knew that he had prepared the Forms 1040. In addition, Gerald assured petitioner that Gelda properly prepared the Form 1040 and that it presented no problem for her. We conclude that petitioner did not know, and did not have reason to know, that the deductions would give rise to a substantial understatement.

In determining whether it would be inequitable to hold petitioner jointly liable for the deficiencies, we consider whether she significantly benefited from the erroneous items of the other spouse. Purificato v. Commissioner, 9 F.3d 290, 296 (3d Cir. 1993), affg. T.C. Memo. 1992-580; Estate of Krock v. Commissioner, 93 T.C. 672, 677 (1989). Any significant benefit received by petitioner must be considered in the totality of the circumstances. Busse v. United States, 542 F.2d 421, 427 (7th Cir. 1976). Normal support is not considered a significant benefit. Belk v. Commissioner, 93 T.C. 434, 440 (1989). We look at the lifestyle to which the taxpayer is accustomed when considering what constitutes normal support. Id.

Gerald invested in his businesses the tax savings derived from the tax shelter investments. The tax savings were not used to better petitioner's standard of living. Gerald sold his business interests in 1984 and 1985, and petitioner received no proceeds from those sales.

Petitioner's family vacations and use of the pleasure boat were consistent with the lifestyle to which the Jacobys had

become accustomed.  That lifestyle did not change during the years in issue.  Petitioner received no large gifts from Gerald during the years in issue, and the monthly allowance she used to pay household expenses did not increase during the years in issue.

We also consider whether the spouses have been divorced. Friedman v. Commissioner, 53 F.3d at 532; Flynn v. Commissioner, 93 T.C. 355, 367 (1989).  Petitioner and Gerald separated in April 1984 and divorced in 1992.  When they separated, petitioner received the marital residence.  Petitioner obtained a home equity loan and used most of the proceeds to pay the tax liabilities attributable to the 1975-77 deficiencies.  Gerald agreed to pay petitioner $5,000 a month to amortize the home equity loan, but he reneged on that agreement.  Given Gerald's financial condition, we consider inconsequential any obligation he may have had to reimburse petitioner pursuant to the separation agreement.  Petitioner avoided bankruptcy by selling the marital residence and using the proceeds to pay the home equity loan.

As for the deficiencies related to the years in issue, Gerald and respondent entered into a settlement.  Respondent assessed deficiencies against Gerald for the taxable years 1978, 1979, and 1980, but Gerald filed in bankruptcy and was discharged from liability.

Gerald invested in tax shelters in the taxable years 1975 through 1980, and the tax savings derived from the tax shelter investments went into his businesses.  Gerald left petitioner with the deficiencies for the taxable years 1975 through 1977, which she paid.  Respondent now intends to collect from petitioner the deficiencies for the taxable years 1978 through 1980.  In short, Gerald made the investments, appropriated the benefits, and left petitioner with the tab.  We conclude that it would be inequitable to hold petitioner liable for the deficiencies.

We hold that petitioner qualifies as an innocent spouse.

To reflect the foregoing,

<u>An appropriate decision will be entered in accordance with the stipulation of settlement as to petitioner Gerald Jacoby, and decision will be entered for petitioner Arlene Jacoby</u>.