T.C. Memo. 1996-353


UNITED STATES TAX COURT


ANGELA SCHWIMMER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 24583-93.                    Filed August 1, 1996.


<u>Robert D. Howard</u>, for petitioner.

<u>Catherine R. Chastanet</u> and <u>Peggy Gartenbaum</u>, for
respondent.


MEMORANDUM FINDINGS OF FACT AND OPINION

SWIFT, <u>Judge</u>:  Respondent determined deficiencies in and
additions to petitioner and her husband Martin J. Schwimmer's
(Martin's) joint 1981, 1982, 1983, and 1984 Federal income taxes
as follows:

| | | Additions to Tax | | | |
|------|------------|---------------|---------------|---------------|------------|
| Year | Deficiency | Sec. 6653(b) | Sec. 6653(b)(1) | Sec. 6653(b)(2) | Sec. 6661 |
| 1981 | $ 202,543 | $101,272 | --- | --- | --- |
| 1982 | 1,648,220 | --- | $ 824,110 | * | $409,875 |
| 1983 | 3,038,233 | --- | 1,519,117 | * | 746,901 |
| 1984 | 768,593 | --- | 384,297 | * | 192,148 |

* 50 percent of interest due on portion of underpayment attributable to fraud.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

Petitioner, in general, does not contest the correctness of respondent's determinations regarding the amounts of the income tax deficiencies, nor the additions to tax for fraud and for substantial underpayment of income tax. Petitioner, however, contends that she qualifies as an innocent spouse with regard to the income tax deficiencies and to all additions to tax. Alternatively, petitioner contends that the fraud on which the additions to tax under section 6653 are based is attributable solely to Martin.

FINDINGS OF FACT

Some of the facts have been stipulated and are so found.

Martin and petitioner filed separate petitions regarding the

above income tax deficiencies and additions to tax. At the time petitioner filed her petition, she resided in Kings Point, New York. On September 28, 1994, an Order and Decision was entered with respect to Martin's petition, wherein the Court found that Martin was liable for all income tax deficiencies and all additions to tax determined by respondent.

## Martin's and Petitioner's Education and Business Activity

Martin has a bachelor's degree in public accounting, a master's degree in public administration, and a Ph.D. in accounting. Martin has been a college professor of economics, a financial consultant, an investment adviser to a pension plan, owner of at least seven real estate and leasing business ventures, owner of a Roy Rogers restaurant franchise, and, generally, a wealthy businessman.

Throughout most of the 1970's and 1980's, Martin controlled numerous stock brokerage accounts in his individual name, in petitioner's individual name, and in his and petitioner's joint names. Martin annually engaged in numerous stock transactions involving hundreds of thousands of dollars.

Petitioner has a college degree and a master's degree in speech pathology and audiology. Except for a brief teaching career and an occasional job as a substitute teacher, petitioner has not worked outside the home, and petitioner's primary occupation has been as a mother and homemaker.

Petitioner had only minimal involvement in Martin's business and investment ventures. Martin did not discuss his business ventures or the family's financial affairs with petitioner. Martin never referred to petitioner as his business partner or employee, and Martin discouraged his business associates and contacts from discussing business when petitioner was present.

On records of a number of Martin's business ventures, petitioner was nominally designated as a corporate officer and was vested with authority to sign checks and business documents. Petitioner, however, in these instances, was designated as an officer and held signatory authority only as a convenience to Martin. Petitioner performed no meaningful duties for or on behalf of any of Martin's businesses and investments.

With regard to Martin's stock trading activity, Martin engaged in this activity independently, without petitioner's involvement or participation. Martin made all decisions regarding the stock transactions.

For the Roy Rogers restaurant franchise that Martin owned, petitioner did write some checks to pay bills but only those that Martin and/or his manager had identified and directed petitioner to pay.

During 1981 through 1984, Martin acted as an investment adviser for First United Fund, Ltd. (First United), an investment firm that provided employee benefit plan services and investment advice to labor unions.

In 1983, one of Martin's controlled partnerships made a $615,000 payment representing a contribution into a split-funded defined benefit retirement plan trust. Pursuant to the plan, life insurance policies on Martin's and petitioner's lives were to be purchased, and funds were to be deposited into a separate investment account, to be invested at the discretion of Martin, the plan's trustee and administrator. Martin and petitioner, as participants in the plan, were each a beneficiary on each other's life insurance policies and were entitled to retirement benefits upon reaching retirement age. Before Martin and petitioner reached retirement age or received any benefits, all assets of the plan's trust were forfeited to the U.S. Government, as described below.

Martin's Embezzlement Activity

During 1981, 1982, 1983, and 1984, Martin and a co-conspirator, taking advantage of their relationship with First United, illegally transferred in excess of $16 million from the bank accounts of two labor unions' employee benefit plan trusts to private bank accounts for the personal use of Martin and his co-conspirator.

In June of 1987, Martin was indicted for racketeering, embezzlement, unlawful acceptance of pension kickbacks, conspiracy to defraud the U.S. Government, and income tax evasion.

On February 14, 1989, Martin and his co-conspirator were convicted of racketeering, unlawful acceptance of pension plan kickbacks, embezzlement of employee benefit plan funds, conspiracy to defraud the U.S. Government, and income tax evasion for 1981, 1982, 1983, and 1984 in connection with the scheme to embezzle from the pension funds.

In 1989, Martin entered into a forfeiture agreement under which Martin forfeited to the U.S. Government various assets that were regarded as acquired by Martin with embezzled funds.[1] The amount of funds realized by the U.S. Government upon liquidation of these assets is not found in the record. Also in 1989, Martin transferred title in the Kings Point residence from his and petitioner's names to just petitioner's name.

In 1990, various assets of Martin that had not been acquired by Martin with embezzled funds were sold, and a total of $812,148 was realized from such sale and credited towards satisfying Martin's obligation under the forfeiture agreement.

In 1992, as a result of his conviction, Martin was sentenced to imprisonment for 10 years, fined $1.6 million, and ordered to

---

[1] Under the forfeiture agreement and pursuant to 18 U.S.C. 1963 (1994), the following assets were regarded as acquired by Martin with embezzled funds and were forfeited by Martin to the U.S. Government: Marketable securities; precious gems; interests in retirement plan and trust of the above-referenced defined benefit plan; 1978 Rolls Royce; 1986 Mercedes Benz; 1984 Corvette; 1974 Buick; 1986 Honda motorcycle; loans receivable from various entities; shares of stock in various corporations; and various limited partnership interests.

pay a forfeiture penalty of $4.5 million to the U.S. Government, as well as other penalties.

Also in 1992, Martin began serving his 10-year term in a minimum security prison in Allenwood, Pennsylvania (Allenwood). In 1994, Martin escaped from Allenwood and was arrested with cocaine in his possession. At the time of trial in this case, Martin was in prison in Florida and under indictment for illegal possession of cocaine.

At no time was petitioner involved in any way in Martin's embezzlement activity. Petitioner had no knowledge of Martin's embezzlement activity until Martin was criminally prosecuted therefor. Petitioner did not have signatory authority on the bank accounts into which the embezzled funds were transferred, and petitioner derived no benefit from the embezzled funds. A large portion of Martin's share of the embezzled funds appears to have been invested in speculative securities. Martin did not maintain the bookkeeping and paperwork associated with these speculative investments in his and petitioner's home. The investments and securities owned by Martin as of February 14, 1989, were forfeited to the U.S. Government on that date pursuant to the forfeiture agreement signed the same day.

## Martin and Petitioner's Marriage and Lifestyle

Martin and petitioner married when petitioner was 18 years of age. At the time of trial, Martin and petitioner had been

married for 26 years.  Petitioner has never been legally separated or divorced from Martin.  From their marriage, Martin and petitioner have two daughters.

Upon their marriage in 1968, Martin and petitioner took a 6-week honeymoon to Europe.

In 1976, Martin purchased for the family a lavish residence in Kings Point, New York.  Between 1976 and 1984, Martin paid for extensive interior decorating and landscaping of this residence and property.

In the family residence, petitioner occasionally hosted social activities for Martin's clients and business associates, and petitioner answered the telephone to take business messages for Martin.  In no other way did petitioner participate in Martin's business affairs.  Martin purposefully and autocratically kept petitioner out of his office and uninformed of his business and financial affairs and of the family finances.

Throughout the 1970's, Martin and petitioner vacationed approximately four to five times a year in locations such as Club Med, Martinique, and Aruba.  During 1981 through 1984, the years in issue, Martin and petitioner and their family traveled less frequently than in prior years.

In 1978, Martin purchased for himself a Rolls Royce.  In 1980, he purchased a Mercedes Benz for petitioner.  By 1980, Martin estimated his net worth to be in excess of $1 million.

In 1980, one of petitioner's daughters developed a serious ear condition that resulted in the daughter's losing her hearing, undergoing several ear surgeries, and becoming severely learning disabled.

In 1982, petitioner's other daughter was diagnosed as having scoliosis which required treatment with full body braces and constant therapy. Petitioner's primary activity during the years in issue was the care of her two daughters.

Prior to 1981, petitioner frequently received a number of expensive items of jewelry from Martin and from other members of her family. During the years in issue, petitioner received no new items of jewelry.

In 1984, Martin purchased for himself a 1984 Corvette, and in 1986, Martin purchased for himself a 1986 Honda motorcycle. Martin did not permit petitioner to drive either of these two vehicles, and Martin purchased no cars for petitioner during the years in issue.

Martin and petitioner did not own any boats and did not belong to any country clubs. Their children generally attended public schools.

During 1976 through 1989, including the years in issue, Martin and petitioner's marital and family lifestyle remained affluent, but during the years in issue their lifestyle was not as affluent as in prior years.

On occasion, petitioner inquired of Martin as to the amount of his income and as to the family's annual living expenses. Martin responded with vague and general answers and refused to provide any specific information to petitioner.

Martin and Petitioner's Joint Income Tax Returns
and Respondent's Audits

For years prior to 1981, and for 1981, 1982, 1983, and 1984, Martin and petitioner filed joint Federal income tax returns. It is not clear from the record who prepared the joint Federal income tax returns filed by Martin and petitioner for years prior to 1981. For 1981 and 1982, Martin prepared the returns. For 1983 and 1984, an accounting firm prepared the returns with the assistance of Martin.

After the tax returns for each year were prepared, Martin presented the returns to petitioner for her signature without giving petitioner any realistic opportunity to review the returns, presenting petitioner with the returns only after they had been prepared and insisting that she sign the returns immediately. This was Martin's general practice with regard to all documents signed by petitioner.

The schedule below reflects Martin and petitioner's joint Federal income tax liabilities for 1970 through 1980 as reported on their returns:

| Year | Tax Liability |
|------|---------------|

| | |
|---|---|
| 1970 | $2,484 |
| 1971 | 1,601 |
| 1973 | 646 |
| 1974 | 260 |
| 1975 | -0- |
| 1976 | 514 |
| 1977 | 135 |
| 1978 | 2,248 |
| 1979 | -0- |
| 1980 | -0- |

On Martin and petitioner's joint Federal income tax returns for 1981, 1982, 1983, and 1984, none of the funds embezzled by Martin were reported.

Martin claimed on his and petitioner's 1983 joint Federal income tax return a deduction of $600,000 reflecting the above-referenced contribution into a Keogh plan.

For years prior to 1981, Martin and petitioner were audited three times by respondent regarding their Federal income tax liabilities, including for 1979 a detailed, line-by-line audit under respondent's taxpayer compliance measurement program (TCMP).  Each of these audits was resolved with minimal adjustments; one or more of such adjustments were in Martin and petitioner's favor.  At the conclusion of the TCMP audit for 1979, petitioner was correctly informed by Martin that respondent had made no adjustment to their 1979 joint Federal income tax return.

After an audit of Martin and petitioner's joint Federal income tax returns for 1981 through 1984, respondent charged Martin with receipt of unreported embezzlement income as follows:

| Year | Embezzlement Income |
|------|---------------------|
| 1981 | $  415,169 |
| 1982 | 3,269,485 |
| 1983 | 5,375,207 |
| 1984 | 1,798,305 |

Respondent also disallowed for 1983 the claimed $600,000 Keogh deduction.[2]

The schedule below reflects the taxable income as reflected by Martin and petitioner on their joint Federal income tax returns for 1981 through 1984 and the corrected taxable income as determined by respondent as a result of the omitted embezzlement income, the disallowed Keogh deduction, and other adjustments:

| Year | Taxable Income Reported | Corrected Taxable Income |
|------|-------------------------|--------------------------|
| 1981 | $  (3,467) | $  411,777 |
| 1982 | 50,227 | 3,330,913 |
| 1983 | 240,751 | 6,256,003 |
| 1984 | (223,789) | 1,574,385 |

Respondent further determined additions to tax for fraud for each year based on the above omitted embezzlement income, and respondent determined the addition to tax for fraud for 1983 also

---

[2]     Petitioner has conceded certain other adjustments, and petitioner acknowledges that, should petitioner be found eligible for innocent spouse treatment, a Rule 155 computation is required with regard to the conceded adjustments.

on the basis of the disallowed $600,000 claimed Keogh deduction. Respondent attributed the alleged fraud for each year not just to Martin, but also to petitioner.

OPINION

Generally, married taxpayers filing joint Federal income tax returns are treated as jointly and severally liable for taxes reported due on their combined income and for additions to tax relating thereto.  Sec. 6013(d)(3).

Because joint and several liability may produce hardship for an "innocent spouse" whose marriage partner received substantial unreported income, Congress enacted section 6013(e), as amended in 1984.  Section 6013(e) provides "innocent spouse" relief from joint and several liability for a taxpayer who filed a joint income tax return and who establishes the following:  (1) That a substantial understatement of tax resulted from a grossly erroneous item attributable to the other spouse; (2) that, in signing the return, the taxpayer did not know, or have reason to know of the understatement; and (3) that, in light of all of the facts and circumstances, it would be inequitable to hold the innocent spouse liable for the resulting deficiency.  Sec. 6013(e)(1); Hayman v. Commissioner, 992 F.2d 1256, 1260 (2d Cir. 1993), affg. T.C. Memo. 1992-228.

Respondent concedes that the embezzlement income that Martin received constitutes a grossly erroneous item for each year and

that it is attributable only to Martin for purposes of section 6013(e)(1)(B). Respondent, however, contends that petitioner had reason to know of the embezzlement income and that it would not be inequitable to hold petitioner liable for the income tax deficiencies and additions to tax relating to the embezzlement income.

With regard to the $600,000 claimed Keogh deduction, respondent concedes that $15,000 thereof represents an allowable deduction on Martin and petitioner's 1983 joint Federal income tax return.

With regard to the application of the innocent spouse provision to the $585,000 balance of the claimed Keogh deduction that is to be disallowed, respondent concedes that the $585,000 constitutes a grossly erroneous item. Respondent, however, contends that the $585,000 is attributable not only to Martin, but also to petitioner, that petitioner had reason to know of the erroneous deduction and the circumstances surrounding the transaction giving rise to the claimed deduction, and that it would not be inequitable to hold petitioner liable for the income tax deficiencies and additions to tax relating to the disallowed $585,000 claimed Keogh deduction.

Generally, an item on a return will be regarded as not attributable to a spouse if he or she was not involved in the activity giving rise to the item. Feldman v. Commissioner, 20

F.3d 1128, 1136-1137 (11th Cir. 1994) (citing <u>Sturm v.</u> <u>Commissioner</u>, T.C. Memo. 1993-172), affg. T.C. Memo. 1993-17.

With regard to the first element of the innocent spouse provision (namely, whether the item in question is attributable only to the other spouse), petitioner, whose testimony generally we regard as credible, did not recall even knowing of the existence of the defined benefit plan and the life insurance policies.  No evidence indicates to the contrary.  Petitioner derived no actual benefit from either the defined benefit plan or the life insurance, and the defined benefit plan and the life insurance policies were forfeited under the forfeiture agreement.

We conclude that, for purposes of the grossly erroneous requirement of the innocent spouse provision, the $585,000 erroneously claimed Keogh deduction is attributable solely to Martin and not to petitioner.

With regard to the second element of the innocent spouse provision (namely, whether the claimed innocent spouse had reason to know of the understatement), among the factors that are generally relevant are the following:  (1) The alleged innocent spouse's level of education; (2) the alleged innocent spouse's involvement in the relevant business and financial affairs; (3) the presence of expenditures that appear lavish or unusual when compared to the taxpayer's and the family's level of income, standard of living, and spending patterns in prior years; and (4) the culpable spouse's evasiveness and deceit concerning the

couple's finances. See <u>Friedman v. Commissioner</u>, 53 F.3d 523, 531 (2d Cir. 1995), affg. in part and revg. in part T.C. Memo. 1993-549; <u>Hayman v. Commissioner</u>, <u>supra</u> at 1261 (citing <u>Erdahl v. Commissioner</u>, 930 F.2d 585 (8th Cir. 1991), and <u>Price v. Commissioner</u>, 887 F.2d 959 (9th Cir. 1989)); <u>Stevens v. Commissioner</u>, 872 F.2d 1499, 1505 (11th Cir. 1989), affg. T.C. Memo. 1988-63; <u>Levin v. Commissioner</u>, T.C. Memo. 1987-67.

With regard specifically to large deductions resulting in substantial understatements, the Court of Appeals to which appeal in this case lies has stated that a taxpayer claiming innocent spouse status must establish that he or she was "unaware of the circumstances that gave rise to the error on the tax return". <u>Hayman v. Commissioner</u>, <u>supra</u> at 1262. A duty to inquire also exists as to the propriety of large deductions reported on joint tax returns. <u>Friedman v. Commissioner</u>, <u>supra</u>; <u>Hayman v. Commissioner</u>, <u>supra</u>; <u>Levin v. Commissioner</u>, <u>supra</u>.

We believe that petitioner has met her burden of proof under the "reason to know" test of section 6013(e) as to both the embezzlement income and the $585,000 erroneously claimed Keogh deduction. The evidence indicates that petitioner's participation in the family finances was very limited and that Martin was extremely autocratic and private in handling his and the family's financial affairs. Martin admitted that he disclosed very little to petitioner regarding his financial activities. Martin generally concealed information from

petitioner regarding his income and expenditures and his illegal activities. Neither petitioner's actual knowledge, nor her education and experience alerted petitioner to or gave petitioner reason to know of the existence of Martin's embezzlement income.

With regard specifically to the $585,000 erroneously claimed Keogh deduction, no evidence indicates that petitioner had actual knowledge of or had reason to know of the erroneous nature of this claimed deduction for 1983 or of the transactions underlying the deduction. During the years in issue, nothing occurred in Martin and petitioner's lifestyle to put petitioner on notice of the circumstances giving rise to the erroneously claimed Keogh deduction.

We conclude, on the facts of this case, that petitioner met her duty to inquire as to the information reported by Martin on his and petitioner's Federal income tax returns for the years in issue and specifically as to the Keogh deduction claimed for 1983. Petitioner did make inquiries of Martin about the family's costs of living, was not allowed to participate in Martin's business affairs or the family's financial affairs, was not given any meaningful opportunity to review the tax returns for the years in issue, knew that Martin and she had successfully survived several audits of their returns, including a TCMP audit for 1979, wherein very low tax liabilities were determined, and she was subjected to Martin's autocratic and dominating personality.

We conclude that petitioner had no actual knowledge of and had no reason to know of either the omitted embezzlement income or of the erroneous nature of the $585,000 claimed Keogh deduction.

With regard to the last element of the innocent spouse provision (namely, whether it would be inequitable to hold petitioner liable for the income tax deficiencies and additions to tax relating to the embezzlement income and to the $585,000 erroneously claimed Keogh deduction), a key factor in the analysis is whether the person seeking relief significantly benefited, directly or indirectly, from the tax savings that resulted from the omitted income and from the erroneous deduction.

In determining whether a taxpayer significantly benefited from omitted income and from erroneous deductions, normal support received from a spouse will not be regarded as a significant benefit.  Sec. 1.6013-5(b), Income Tax Regs.  Further, in considering whether a benefit is to be regarded as normal support, the lifestyle to which the taxpayer is accustomed is taken into account.  Belk v. Commissioner, 93 T.C. 434, 440 (1989).

Petitioner has met her burden of proving that she received no significant benefit, directly or indirectly, either from Martin's embezzlement activity or from the $585,000 erroneously claimed Keogh deduction.  During the years in issue, petitioner

received only customary spousal and family support.  Martin appears to have used the majority of the embezzled funds to finance his speculative investments, in which petitioner did not participate and from which she did not benefit.  Even were we to assume that the defined benefit retirement plan and the luxury cars were purchased with embezzled funds, such property was forfeited to the U.S. Government pursuant to the forfeiture agreement, and petitioner appears to have derived no benefit therefrom.

The evidence in this case regarding the King's Point residence, luxury cars, jewelry, and vacation trips simply reflects petitioner's continuing, if not diminished, lifestyle during the years in issue.

Respondent speculates that Martin's transfer, after his conviction, to petitioner of title in the Kings Point residence reflected:  (1) An attempt to place the Kings Point residence out of reach of the forfeiture agreement; and (2) an intent on petitioner's behalf to interfere with the collection of criminal penalties imposed upon Martin.  Respondent thus suggests that it would be inequitable for petitioner not to be held liable for the income tax deficiencies and additions to tax at issue herein.  We disagree.  Respondent's speculations are not supported by the record.

We conclude that petitioner is not liable for the deficiency in income tax and additions to tax for each year attributable to

Martin's embezzlement activity and to the erroneously claimed Keogh deduction.

Because of our conclusion as to petitioner's status as an innocent spouse, petitioner's alternative argument that the fraud additions to tax that are at issue in this case should not apply to petitioner is moot, and we decline to address that alternative argument.

<u>Decision will be entered</u> <u>under Rule 155</u>.