**In re Nancy R. CAPASSO, Debtor.**

**Bankruptcy No. 97–B–41813(CB).**

United States Bankruptcy Court, S.D. New York.

July 8, 1998.

---

Windels, Marx, Davies & Ives (James M. Shaughnessy, Charles E. Simpson, of counsel), New York City, for Nancy R. Capasso.

United States Attorney's Office (Neil M. Corwin, Kay K. Gardiner, of counsel), New York City.

### DECISION DETERMINING THE VALIDITY OF INNOCENT SPOUSE DEFENSE.

CORNELIUS BLACKSHEAR, Bankruptcy Judge.

Debtor and petitioner, Nancy R. Capasso, herein seeks a determination that she should be exempted from her joint income tax liability for the 1980, 1981, and 1982 tax years as an "innocent spouse" pursuant to 26 U.S.C. § 6013(e) (the "Internal Revenue Code"). Alternatively, respondent, the United States of America, requests a judgment consistent with § 505(a) of Title 11 of the United States Code (the "Bankruptcy Code") that Mrs. Capasso is liable for federal income tax deficiencies totaling in excess of one million dollars, including interest and penalties for the aforementioned tax years resulting from a tax fraud perpetrated by her former husband, Carl A. ("Andy") Capasso. This decision results from a trial held on March 5, 6, and 10, 1998, and the supporting motions, affidavits, transcripts, and testimony submitted to this Court.

### STATEMENT OF FACTS

Mr. and Mrs. Capasso were married on March 28, 1971. Mrs. Capasso had three children from her former marriage and during her marriage to Andy Capasso, had two more children. Early in Andy and Nancy Capasso's relationship, Andy Capasso left his job at his father's sewer contracting company and formed his own construction and sewer contracting company which he named Nanco Contracting Corporation (hereafter "Nanco"). Nanco began as a small operation based out of the Capassos' home. From the time of its inception, Andy Capasso was the sole shareholder of Nanco and Mrs. Capasso was the secretary and vice president. (Stipulation of Facts ("Stip.") pp. 115–117; Trial Transcript ("Trial Tr.") pp. 30, 1.24—31, 11. 19–21). Mrs. Capasso handled Nanco's payroll records, picked up bids, made deliveries, and answered the telephones. (Stip. pp. 110–111; Trial Tr. p. 32, 11. 3–23). Mrs. Capasso's daily involvement with Nanco diminished by the mid–1970's; however, she continued to maintain at home, records of Nanco's bond retainage [1] (Stip. p. 126; Trial Tr. p. 41, 11, 2–5) and personally co-guaranteed certain of Nanco's obligations. (Stip. pp. 178–179; Ex. 41–AO). In 1986, Nanco employed over 400 people and boasted $200

---

1. In order to ensure the satisfactory completion of city contracts, the city retained a certain percentage of Nanco's fees for city projects in a non-interest bearing account, known as a "retainage account." However, Nanco was permitted to substitute municipal bonds for the retainage, thereby freeing up cash and permitting Nanco to earn interest during the retainage period (the "bond retainage").

million dollars in city contracts. (Stip.120–123).

As Nanco became increasingly successful, the Capassos experienced a parallel lifestyle change. Having started out in a small house in Greenvale, Long Island, the couple soon moved to and spent most of their early years of marriage in a large seven bedroom house on three (3) acres of land in affluent Old Westbury, Long Island. During this time, the Capassos employed two (2) full-time, live-in housekeepers and had chauffeured limousines at both of their disposal. In addition, they owned vacation properties in Westhampton Beach, N.Y. and Florida.

In 1980, the Capassos sold their Old Westbury home and purchased a ten room duplex apartment for $764,897.00 in cash in a building on Fifth Avenue in Manhattan. The Capassos proceeded to spend two (2) million dollars on renovations and another million dollars on antiques and paintings for the Fifth Avenue apartment. In May 1981, Andy Capasso acquired another Westhampton Beach property, 37 Exchange Place, for $870,000.00. All of the bills for the renovations of the Fifth Avenue apartment as well as Mrs. Capasso's credit card bills and daily necessities, were paid by Nanco funds as authorized by Mr. Capasso. (Trial Tr. pp. 223, 1.18—224, 1.25; 228, 11.3–6; Trial Exhibit ("Ex.") 18–R3, p. 140, 11.22–25). Mrs. Capasso states that she had nothing to do with the payment of any bills and did not inquire into how they were being paid. (Trial Tr. p. 228, 11.7–21).

In January 1983, Andy Capasso commenced an action in the Supreme Court of the State of New York, County of New York, seeking a divorce, and Mrs. Capasso counterclaimed for divorce.[2] (Trial Exs. 60–BH, 61–BI). The divorce action was extremely long, bitter, and hotly contested, particularly with respect to custody of the children (which was awarded to Mrs. Capasso) and the division of the marital property. The judgment of divorce was entered on December 18, 1985. The opinion regarding the division of marital property, however, was not entered until July 2, 1987 by the Appellate Division (Stip. p. 66; Ex. 11–K) and was not implemented

for over a month thereafter. (Ex. 12–L). Mrs. Capasso was awarded marital assets totaling $5.63 million. (Stip. p. 136; Exs. 11–K, 12–L). After various payments to professionals, relinquishing of property to the government, gifts and taxes, Nancy Capasso netted approximately $1.32 million.

On June 26, 1985, the Internal Revenue Service (hereafter "IRS") issued a notice of deficiency to Mr. and Mrs. Capasso for the taxable year, 1980. (Joint Pre–Trial Ex. 1–A; Stip. p. 3). On August 9, 1985, the IRS issued a notice of deficiency to the Capassos for the taxable year, 1981. (Ex. 2–B; Stip. p. 5). Finally, on September 11, 1991, the IRS issued further notice of tax deficiency to Mrs. Capasso individually for the taxable year, 1982. (Ex. 3–C; Stip. 7).

On September 23, 1985 and November 12, 1985, Mrs. Capasso petitioned the United States Tax Court for a redetermination of these deficiencies. During the course of the proceedings before the Tax Court, Mrs. Capasso agreed to the IRS's determinations regarding the amount of her income tax liability based on her joint income returns for 1980, 1981, and 1982. Consequently, on September 17, 1996, the IRS and Mrs. Capasso filed Stipulations of Settled Issues in which the parties agreed that Mr. and Mrs. Capasso failed to report constructive dividends from Nanco in the amounts of $406,541.00, $633,700.00, and $295,635.00 for the taxable years 1980, 1981, and 1982, respectively. (Stip. p. 10; See Exs. 4–D, 5–E & 6–F). However, Mrs. Capasso objected to the imposition of liability based on the grounds that (a) she was entitled to innocent spouse relief and (b) she signed the 1980, 1981, and 1982 returns under duress. (Stip. p. 11). Mrs. Capasso claimed that her signature on the 1980 tax return was forged, that she could not recall ever signing the 1981 tax return, and that until the government showed them to her in 1997, Mrs. Capasso had never even seen either return. (Trial Tr. pp. 101, 1.21—102, 1.2; 104, 1.22—105, 1.8). In addition, Mrs. Capasso claims that she signed the 1982 tax return on the advice of her attorney even though she had estimated the numbers to be

---

**2.** *Capasso v. Capasso*, 129 A.D.2d 267, 517 N.Y.S.2d 952 (1987).

different than they were when she signed it. (Exs.13–M, 16–P, 15–0, 48–AV).

On October 7, 1996, Mrs. Capasso filed two motions with the Tax Court seeking to have Andy Capasso severed from the proceedings. (Ex. A). Although the IRS made no objections to Mrs. Capasso's motions to sever, the Tax Court denied her request on October 30, 1996. (Ex. B).

On March 20, 1997, the day before a scheduled trial in the Tax Court for the innocent spouse and duress claims, Nancy Capasso filed a voluntary petition consistent with Title 11 of the United States Code (the "Bankruptcy Code"). The government moved, by order to show cause, to dismiss the debtor's petition or, in the alternative, to lift the automatic stay so that the debtor's innocent spouse and duress claims could proceed to trial before the Tax Court. On May 23, 1997, this Court denied the government's motion and assumed jurisdiction pursuant to 11 U.S.C. § 505(a). The trial of the innocent spouse defense took place before this Court on March 5, 6, and 10, 1998. At the conclusion of the trial the debtor, Mrs. Capasso, withdrew her claim that she had signed her 1982 joint income tax return under duress. (Trial Tr. p. 314, 11. 17–24).

## DISCUSSION

This Court has subject matter jurisdiction over the above captioned case pursuant to 28 U.S.C. §§ 1334(b) and 157(a) and the standing Referral Order of this district dated July 10, 1984. This is a core proceeding consistent with 28 U.S.C. § 157(b)(2). This Court is called upon to decide only one issue: whether Mrs. Capasso can be deemed an "innocent spouse." Pursuant to the Internal Revenue Code, an individual filing a joint income tax return with his/her spouse is jointly and severally liable for any income tax deficiency arising from that return. *See* 26 U.S.C. § 6013(d)(3). However, it is recognized that there are situations where imposing liability on one spouse would be an unjust measure. Consequently, the Internal Revenue Code provides a waiver from liability to an "innocent spouse" who can demonstrate that:

(1) a joint return was filed in which (2) there was a "substantial understatement of tax attributable to grossly erroneous items of one spouse," (3) that the other spouse establishes that, in signing the return, they did not know and had no reason to know that there was such substantial understatement, *and* (4) under all the surrounding facts and circumstances, it would be inequitable to hold the other spouse liable for the resulting deficiencies.

*Friedman v. Commissioner,* 53 F.3d 523, 527–528 (2d Cir.1995) (emphasis added).

In order to qualify for innocent spouse relief, an individual has the burden of proving each of the four statutory elements by a preponderance of the evidence. *Id.* at 528. Furthermore, § 6013(e) is considered a remedial provision and therefore is to be "construed and applied liberally in favor of the person claiming its benefits." *Id.* at 528–529. In this case, both parties stipulated prior to trial that Mrs. Capasso need not address the first two elements of § 6013(e) because the government had already so established. Accordingly, at trial, Mrs. Capasso had the burden of proving with respect to each tax return, (1) that she did not know and had no reason to know of the substantial understatement of income tax and (2) that under the circumstances it would be inequitable to hold her liable for the tax deficiencies.

## A. Knew or Should Have Known

In determining whether a spouse had knowledge of the understatement of income tax, the case law makes a distinction between understatements resulting from omissions of income and those resulting from disallowed deductions. "In cases involving the omission of income, the relevant inquiry is whether the taxpayer knew or should have known of an income producing transaction that her spouse failed to report on their joint return." *Hayman v. Commissioner,* 992 F.2d 1256, 1261 (2d Cir.1993). Thus, "mere knowledge of the underlying transaction that produced the omitted income is sufficient to deny innocent spouse relief." *Erdahl v. Commissioner,* 930 F.2d 585, 589 (8th Cir. 1991), *quoted in Hayman,* 992 F.2d at 1261. However, in cases involving disallowed de-

ductions, the inquiry is not whether the spouse knew or should have known of the transactions giving rise to the deductions, but whether the spouse knew or had reason to know that the deduction in question would give rise to a substantial understatement of tax. *Hayman*, 992 F.2d at 1261.

In either case, the spouse seeking relief from liability must demonstrate that they did not have actual knowledge and, moreover, that they had no reason to know of the understatement. The inquiry then becomes whether "a reasonably prudent taxpayer in her position at the time she signed the return could be expected to know that the return contained the substantial understatement." *Hayman*, 992 F.2d at 1261 (quoting *Price v. Commissioner*, 887 F.2d 959, 965 (9th Cir.1989)). There are four recognized factors which the court should consider in making its determination as to whether the party should have been "expected to know":

> (1) the spouse's level of education; (2) the spouse's involvement in the family business and financial affairs; (3) the presence of expenditures that appear lavish or unusual when compared to the family's past levels of income, standard of living and spending patterns; and (4) the culpable spouse's evasiveness and deceit concerning their finances.

*Reser v. Commissioner*, 112 F.3d 1258, 1269 (5th Cir.1997).

Additionally, a spouse may not seek relief if they had failed to make reasonable inquiries about the joint returns. The innocent spouse provisions were not designed to "protect willful blindness or to encourage the deliberate cultivation of ignorance." *Friedman*, 53 F.3d at 525. Accordingly, if a spouse knows "enough facts to put her on notice that ... an understatement exists, ... a duty of inquiry arises which, if not satisfied by the spouse, may result in constructive knowledge of the understatement being imputed to her." *Price*, 887 F.2d at 965. There is no dispute that Mrs. Capasso lacked actual knowledge that her 1980 and 1981 joint income tax returns understated the amount of tax owed. The dispute between the parties is directed at whether such knowledge should be constructively imputed to her because of her failure to inquire about the returns.

The government's contention is that a reasonable taxpayer in Mrs. Capasso's position would have questioned the legitimacy of the returns. The government argues that Mrs. Capasso has a college degree, was not unfamiliar with business matters, and continually consulted with her husband about the financial affairs of Nanco. In addition, they assert that a reasonable taxpayer in Mrs. Capasso's position would have recognized that her lifestyle had significantly changed between 1980 and 1981 when the Capassos acquired two very expensive properties: the Fifth Avenue apartment and the 37 Exchange Place vacation home in Westhampton Beach. Mrs. Capasso admitted that she harbored doubts concerning whether business funds were being used to pay for the lifestyle changes that occurred between 1980–1981. (Trial Tr. p. 189, 11.11–17). Furthermore, Mrs. Capasso stated that she anticipated that her accountants would uncover tax fraud when they examined the manner in which her husband had paid for the purchase and renovation of the Fifth Avenue apartment. (Ex. 33–AG, Tape Tr. p. 5–6; Trial Tr. pp. 190, 1.23—192, 1.24). More specifically, the government points to a statement where during trial, Mrs. Capasso testified that her husband told her that the Fifth Avenue apartment was being financed through a loan from Nanco, but Mrs. Capasso never knew the terms of the loan and thought it might be "fancy bookkeeping." (Trial Tr. pp. 180, 11.5–9 and 15–17—181, 11.2–9; Ex. 18–R3, pp. 132, 1.23—133, 1.7; Deposition of petitioner "Dep." p. 85, 11.8–13 and 20–22).

The government argues that Mrs. Capasso's failure to make any inquiries is convenient and questionable considering the fact that the couple had filed joint returns since 1971. (Stip. p. 203). Mrs. Capasso told this Court at trial that she never saw the 1980 or 1981 return. (Trial Tr. pp. 101, 1.21—102, 1.2; 104, 1.22—105, 1.8). A reasonable taxpayer in Mrs. Capasso's position, it is contended, would have had sufficient information to know that something was amiss and would have at the least inquired as to whether tax

returns were filed for the years in question if they had no recollection of signing any.

Mrs. Capasso further testified before this Court that she had no reason to know that her husband under reported his income for 1982. (Trial Tr. pp. 146, 1.17—147, 1.8). However, the government claims that such testimony directly contradicts Mrs. Capasso's own sworn admissions attesting to her knowledge that her husband's income exceeded $900,000 in 1982. (Exs. 13–M, ¶ 32 & 15–O, ¶ 7(N),(O)). Despite this knowledge, the 1982 tax return reported a total income of negative $129,563.00. (Ex. 48–AV). Thus, the government argues that Mrs. Capasso had ample reason to know that the return omitted substantial amounts of her husband's income when she signed it in October 1983. Moreover, Mrs. Capasso estimated that her own tax liability for the year was in excess of $10,000.00 (Ex. 14–N at 73) and yet, the 1982 return claimed a refund of $2,698.00. In light of such a substantial discrepancy between the return and her own estimate of her tax liability and her knowledge of Mr. Capasso's 1982 income, the government reasons that Mrs. Capasso had purpose to know that the tax return contained an understatement. *See also Bliss v. Commissioner*, 59 F.3d 374, 379 (2d Cir.1995).

Mrs. Capasso asserts various rebuttal arguments to the government's accusations and support her innocent spouse defense. Briefly stated, Mrs. Capasso argues that she had limited involvement in Nanco's business and therefore, had no reason to know of Andy Capasso's omitted income on the 1980 and 1981 tax returns. In addition, she claims that she did not review the 1982 tax return when she was told to sign it by her attorney. (Trial Tr. pp. 107, 11 .15–16; 208, 11.3–19).

Debtor states that she has little to no formal education and no true understanding of the financial stature of Nanco. Mrs. Capasso points out that she has her degree in nursing and has no training or education in accounting. (Trial Tr. pp. 29, 11.17–19; 53, 11.8–11; 206, 11.9–11). Mrs. Capasso claims that her husband did not discuss financial matters with her at any time and, at all times, he had the attitude that he ran the business and the money while she ran the home. (Trial Tr. pp. 54, 11.7–22; 57, 11.3–8; 62, 1.6—64, 1.13; 66, 1.17—73, 1.9; 88, 11.4–19; 303, 1.23—304, 1.23). Concerning the Fifth Avenue apartment, Mrs. Capasso argues that the evidence demonstrates that the spending was not out of line with the spending for prior years. (Trial Tr. p. 80, 11.15–20). Mrs. Capasso maintains that the "undisputed evidence" that she did not sign the 1980 return and does not recall signing the 1981 return proves that she did not act unreasonably in failing to inquire apropos of the returns. Moreover, Mrs. Capasso felt that since each of their returns was prepared by a certified public accountant, it must be correct.

Specific to the 1982 tax return, Mrs. Capasso argues that she fulfilled her duty of inquiry by having the tax return reviewed by her attorney at the time, who then advised her to sign it.

■ Assuming arguendo that Mrs. Capasso did not see the 1980 or 1981 returns, this Court still holds that Mrs. Capasso failed to fulfill her duty of inquiry regarding those returns. It would be reasonable to assume, as the IRS contends, that Mrs. Capasso, having been substantially involved in the start up of Nanco, would inquire as to whether her joint tax returns were filed for the years in question. Mrs. Capasso was an educated woman, she was well versed in her husband's business dealings, and she was aware that between 1980–1981 the Capassos were spending an unusually large amount of money. A reasonable taxpayer in Mrs. Capasso's position would have had reason to know that there was something amiss regarding the 1980 and 1981 joint tax returns. She and her husband had acquired two luxury homes within a year and a half under circumstances that would suggest to a reasonable taxpayer that business funds may have been comingled with personal funds to effectuate these transactions. At the same time, Mrs. Capasso did not know and chose not to inquire as to whether tax returns had been filed for these two years.

■ As to the 1982 tax return, this Court finds that Mrs. Capasso had per se knowledge that the return she was signing severe-

ly underestimated her income tax liability regardless of her attorney's advice. At trial, it was established that prior to signing her 1982 tax return, Mrs. Capasso had estimated her husband's income to be in excess of $900,000.00, yet the 1982 tax return that she signed reported a total income of negative $129,563.00. (Exs. 13–M, 15–O, and 48–AV). Moreover, Mrs. Capasso's estimate of her tax liability for 1982 was in excess of $10,000.00 but she still signed a tax return for 1982 claiming a refund of $2,698.00. (Exs. 14–N & 48–AV). Mrs. Capasso has failed to satisfy by a preponderance of the evidence that she did not know and had no reason to know of the substantial understatement reported on her 1980, '81, and '82 tax returns.

## B. Equitable Result

██ Debtor is not entitled to an innocent spouse defense unless she demonstrates that "taking into account all other factors and circumstances" it would be "inequitable" to hold her liable. 26 U.S.C. § 6013(e)(1)(D).

The government sets forth that at trial Mrs. Capasso failed to establish by a preponderance of the evidence that it would be inequitable to hold her liable for the understatements of income tax. They argue that she received and continues to receive significant benefits from these understatements. Beginning in 1980, the government contends that Mrs. Capasso enjoyed an increased and remarkably lavish lifestyle. The government points out that Mrs. Capasso lived in the extravagant Fifth Avenue apartment for over seven years and through her divorce judgment, she received more than 2.2 million dollars in net proceeds from its sale. (Dep. p. 89, 11. 6–15; Trial Tr. p. 235, 11. 3–6). Mrs. Capasso also had the use of the 37 Exchange Place property in Westhampton Beach as a family retreat for several years and received the property as part of her divorce judgment. (Ex. 10–J; Stip. 93, 97, 126; Trial Tr. p. 243, 11. 6–9). Furthermore, Mrs. Capasso had the use of several credit cards in Nanco's name and was paid as an employee of Nanco. (Trial Tr. p. 225, 11. 10–19; Exs. 18–R2 & 18–R3; 139, 1. 25—140, 1.6 & 11. 12–16). The government also argues that from the money she netted in her divorce, Mrs. Capasso bought and renovated an apartment on the Upper East Side of Manhattan, settled a personal liability suit to the Aetna Insurance Company, used approximately $250,000.00 to pay back taxes which she owed individually, gave over $500,000.00 to her children in order to shelter money from the IRS, and invested the rest in an account with Oppenheimer & Company. (Trial Tr. pp. 235, 11. 7–14—239, 11. 9–16; 243, 11. 16–19).

The government counters Mrs. Capasso's argument that she would suffer an economic hardship by pointing to the fact that she has transferred significant amounts of money to her children with the hope of evading collections should she be held liable. Nor, do they believe that she should be rewarded for her "willful ignorance." The government claims that Mrs. Capasso quickly uncovered her husband's financial improprieties and intended to use that knowledge to her advantage.

On the other hand, Mrs. Capasso argues that the Court must conduct a "fact-intensive inquiry into the surrounding facts and circumstances" in order to determine whether it would be inequitable to hold Mrs. Capasso liable for the deficiencies. *Friedman*, 53 F.3d at 532. Mrs. Capasso compels this Court to be mindful of the Second Circuit's mandate that "since this provision of the tax law is remedial in nature, it is construed and applied liberally in favor of the person claiming its benefits." *Id.* at 528–29. Mrs. Capasso concludes that this Court should find that it would be inequitable to hold her liable for the deficiencies after conducting this "fact-intensive" inquiry.

Mrs. Capasso further claims that she has not received the "substantial benefits" alleged by the IRS. Mrs. Capasso cites the Second Circuit which declared that "normal support, measured by the circumstances of the parties, is not considered a significant benefit for purposes of this determination." *Id.* at 532. According to Mrs. Capasso, "normal support" must be measured according to what is "ordinary" to that particular family. In her case, Mrs. Capasso argues that her divorce award was "normal" by the Capassos' family standards. She also asserts that since she has already been forced to forfeit ap-

proximately $3 million dollars out of the $5.63 million dollars awarded to her by the Appellate Division as a response to her husband's fraud, it would place an economic hardship on her if she were held liable for the 1980, 1981, and 1982 tax deficiencies now.

Finally, Mrs. Capasso claims that it has long been held that "the overriding purpose of the Bankruptcy Code is to relieve debtors from the weight of oppressive indebtedness and provide them with a fresh start." *Insurance Co. of North America v. Cohn* (*In re Cohn*), 54 F.3d 1108, 1113 (3d Cir.1995). She argues that if this Court holds her liable for the tax deficiencies, interest and penalties, it will be impossible for her to get a fresh start "free from the worries and pressures of too much debt." *In re Noonan*, 17 B.R. 793, 800 (Bankr.S.D.N.Y.1982) (Quoting H.R.Rep. No. 95–595, 95th Cong. 2nd Sess. at 125, 1978 U.S.Code Cong. & Admin.News pp. 5963, 6086).

In the matter at bar, this Court agrees with the government that Mrs. Capasso had the responsibility and good reason to inquire about her joint tax returns. As to the 1980 and 1981 returns, constructive knowledge can be applied to Mrs. Capasso due to her failure to inquire. Mrs. Capasso was well versed in the ways of her husband's business and, was actually a driving force behind the creation and start up of Nanco. In addition, for ten years prior, Mr. and Mrs. Capasso had been filing joint returns. Therefore, it can be concluded that she was not naive when it came to such matters and can be held liable for the 1980 and 1981 deficiencies. As to the 1982 tax return, this Court finds that Mrs. Capasso had actual knowledge of its contents and, regardless of her former attorney's advice, it was Mrs. Capasso's sole responsibility to inquire when she recognized that there was an error in the return according to her own calculations.

## CONCLUSION

For the foregoing reasons, this Court finds that under the requirements of 26 U.S.C. § 6013, it would not be inequitable to hold Mrs. Capasso liable for the understatements on her 1980, 1981, and 1982 tax returns.

Accordingly, debtor request for relief as an "innocent spouse" regarding the aforementioned deficiencies is herein denied. The United States Attorney's Office shall settle an order on five (5) days notice to this Court.